REVISED FEBRUARY 15, 2008
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 14, 2008

Charles R. Fulbruge III
Clerk

No. 07-70013

ROBERT TASSIN, JR.

Petitioner-Appellee

v.

BURL CAIN, WARDEN

Respondent-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:05-CV-00143

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted Robert Tassin of capital murder in a Louisiana state court. His wife Georgina, believing that she might receive a ten-year sentence in exchange for her testimony, testified that Robert had planned to commit armed robbery. Robert denied that there was any plan. The State suppressed evidence of Georgina's sentencing agreement, arguing in close that there was "no deal" and that Georgina had no reason to lie. Robert challenged his conviction on numerous grounds, including an argument that the State misled the jury in violation of the Fourteenth Amendment. The state court found that there had been no promise of a lenient sentence and no Fourteenth Amendment violation.

Robert filed a habeas claim in federal district court; that court held that the state court's decision was contrary to federal law and vacated his conviction, ordering that the writ issue unless Louisiana retried Tassin within 180 days.[1] Louisiana appeals.

I

Wayne Stagner and Eddie Martin worked on a Mississippi tugboat. When they completed a shift one night, they met a young woman named Shirley, Sheila, or Shelia Mills at the Shady Lady Lounge in Louisiana. Martin, Stagner, and Sheila had several rounds of drinks and then drove away from the bar in an attempt to find cocaine to buy. Martin drove, Stagner rode in the passenger's seat, and Sheila sat between them. After stopping at another bar, where they found no cocaine, Mills suggested that they stop at the home of Georgina and Robert Tassin. The men agreed, and Sheila went inside. Georgina later testified that while Martin and Stagner were waiting in the car, the Tassins and Mills hatched a plan to rob Martin and Stagner. The Tassins also informed Sheila that they did not have cocaine but they had Dilaudid, and that they would provide Sheila with the drug if she could get enough money from Martin and Stagner to pay for Dilaudid for the group. Mills emerged to ask Martin for money in exchange for sex. She re-entered the Tassins' home, where she paid the Tassins and they all injected Dilaudid. Mills re-emerged from the home, this time with the Tassins.

The five individuals drove elsewhere, allegedly to look for more drugs. They stopped at another home, where the State argued that the Tassins borrowed a gun and Robert said that he obtained needles. While driving back to the Tassins' home, Sheila asked Martin to stop the car under a bridge because she was going to be sick. She exited the car. Robert claims that at this point,

---

[1] Tassin v. Cain, 482 F. Supp. 2d 764, 775 (E.D. La. 2007).

Stagner pointed a gun at him, demanded drugs and money, and wrestled with him. During the tussle, Robert got possession of Stagner's gun and shot the gun in self defense, wounding Stagner and killing Martin. Stagner, on the other hand, claimed at trial that Robert shot from the back seat in a surprise attack on Stagner and Martin.

The state court severed Georgina's, Robert's, and Mills's cases. Georgina was indicted for first degree murder but pled guilty to armed robbery and received a ten-year sentence. Stagner and Robert also testified at Robert's trial, but Mills did not.

Before trial, Robert asked the State to disclose any information it had on potential deals for a lenient sentence in exchange for Georgina's testimony against her husband.[2] The State responded that it had no information on any deal. Georgina testified that she faced the possibility of a five- to ninety-nine-year sentence for armed robbery. When asked before the jury if her testimony would affect her sentence, she responded that she did not know if it would, and that no promises relating to her testimony had been made.[3] The prosecution

---

[2] Robert's attorney asked for "[t]he existence and substance, and the manner of execution of fulfillment, o[f] any promises, agreements, understandings, or arrangements, either oral or written, between the Government and any prosecution witness or informant or cooperating defendant or his or her attorneys or to their representatives, wherein the government has agreed: . . . c. To recommend leniency in sentencing for any crime or crimes for which he or she is convicted; d. To recommend a particular sentence . . . . To make any other recommendations or benefit or to give any other consideration to him or her."

[3] "Q: Okay. And did you speak to [the District Attorneys] prior to your pleading guilty? Did you speak to the District Attorneys prior to pleading guilty?" "A: Yes, I did." "Q: Alright. And – and you're still in prison right now is that correct?" "A: Yes." "Q: And you're awaiting a pre-sentence investigation?" "A: Yes." "Q: Let me ask you this: Has there been any promises [sic] made to you by the District Attorney's office?" "A: No." "Q: Okay. Has there been any promises made by anyone concerning your testimony today?" "A: No." "Q: What's the – do you know the possible sentence for armed robbery?" "A: Five to ninety-nine years." "Q: And there's been no problem [sic] as far as what sentence you'll get, right? Is that correct?" "A: That's correct." "Q: Okay, so you have the possibility of receiving ninety-nine years, right?" "A: Yes, I do." "Q: And – before you pled guilty, you said, 'I'll take that chance, I'll take a chance whether I got ninety-nine years wouldn't bother me.'" "A: Yes I did." "Q: Alright . . . Do you feel that what you testified to today will have any bearing on what sentence you get?" "A: I don't

then suggested to the jury that Georgina had no reason to lie, since she faced up to a ninety-nine year sentence.[4] According to an affidavit of Georgina's attorney, however, the judge presiding over her case had indicated that he would sentence her to twenty to thirty years, or as low as fifteen years, if she waived the marital privilege and possibly ten years if her testimony was consistent with her police statement.[5] Georgina also testified in post-conviction proceedings that when

know. . . ." "Q: All right, at the time of pleading guilty, wasn't there an agreement between you and the District Attorney's office that if you would testify against your husband they would reduce the charge to armed robbery so you would – and you would plead guilty? Isn't that true?" "A: No." "Q: There's been no promise like that? Okay. You remember the Boy – a Boykinization Form, huh? Do you know what that was?" "A: That was a plea bargain." "Q: Okay. A plea bargain. All right. Now as part of your plea bargain, you're telling this Court and this jury that there was not a promise from the District Attorney's office to reduce the charges to armed robbery for you to testify against your husband?" [Pause while witness reviews her Waiver of Constitutional Rights form.] "Q: Ms. Tassin, have you had an opportunity to look over the Waiver of Constitutional Rights Form?" "A: Yes." "Q: Okay. My question to you was, was there a promise from the District Attorney's office that they would reduce the charge to the armed robbery, if you would agree to testify against your husband?" "A: Yes." "Q: It's in there, isn't it?" "A: Yes. . . ." "Q [on re-direct]: Ms. Tassin, you're aware that you could receive five to ninety-nine years in connection with your plea to armed robbery, is that right?" "A: Right." "Q: Are you aware that it's the Judge that sentences you to that term, not the District Attorney?" "A: I'm aware of that." "Q: Are you aware that I have no power to give you five to ninety-nine years?" "A: I'm aware of that."

[4] The prosecution stated, "[D]oes she have any reason to lie to anybody? She faces up to ninety-nine years in jail for armed robbery. Mr. DeLaup questioned her, were any deals made with you, Georgina, about how much time you're going to do in jail? She said, none. Mr. DeLaup asked her, how long can you spend in jail? She said, up to ninety-nine years. She knows where she's going to be. She understood that only the Judge can sentence her, and only the Judge can decide how much time she's going to get in jail. So she had no reason to lie to anybody on the stand here today, during the course of the trial."

[5] Affidavit of Robert Pastor (Feb. 7, 1992) ("[D]iscussions were conducted in the chambers of Judge Karno's courtroom, at which time the judge stated that he would normally sentence a first offender pleading guilty to an armed robbery at which a homicide occurred to 20 to 30 years, but that if Mrs. Tassin waived her marital privilege and testified he would sentence her to 15 years; the judge said at this meeting that if Mrs. Tassin's testimony was consistent with her police statements and he approved it, he might drop down to a 10 year sentence . . . there was at least one representative of the district attorney's office present during this meeting with Judge Karno . . . and [Pastor] communicated the plea offer to [Georgina] as follows: she would plead guilty to armed robbery, waiver her marital privilege and testify for the state in a manner consistent with her police statement, and she would probably be sentenced to ten years . . . ."). In other testimony, Pastor stated that the judge told

she had testified at trial, she believed that she would receive a ten-year sentence.[6] At trial, Robert and his attorney were unaware that Georgina had a favorable sentencing bargain, more favorable than a plea of armed robbery with the potential for ninety-nine years in prison. They learned of the deal only when an inmate forwarded Robert a letter following Robert's conviction and sentencing. Georgina had been writing letters to a male "pen pal" inmate named C.J. Jenkins or "Shorty," who sent Robert one of Georgina's letters[7] to reassure him that Georgina's letters to Jenkins were friendly and not amorous. The letter referenced the possibility of a sentencing deal.[8]

A jury found Robert guilty of first degree murder in May 1987, and the court sentenced him to death. The Louisiana Supreme Court affirmed Robert's conviction on direct appeal[9] and rejected Robert's later application for a re-hearing. Robert filed his first application for post conviction relief in August 1990. The state court rejected that petition in August 1994, rejecting Tassin's

---

him that he normally sentenced first offenders to fifteen to twenty years.

[6] "Q: At trial, at your husband's trial, you were asked, 'Is there a deal between you and the State for your testimony against your husband?' And you answered, 'No.' Correct?" "A: Correct." "Q: But, in fact, you had been told that you would likely get a sentence of 10 years, isn't that correct?" "A: That I was looking at 10 years, yes." "Q: 'Looking at' means to you likely, good chance?" "A: Yes.". . . "Q: When you said, 'the judge told me I'm looking at 10 years and I might get six,' that's what you had been told by your attorney, correct?'" "A: Right." . . . "Q: You remember the questions we looked at [in the trial transcript] about the ninety-nine years? There were two of them?" "A: Yes." "Q: When you answered those questions, in your mind it was still your understanding that you were going to get 10 years, you were looking at 10 years; is that correct?" "A: Right, it was."

[7] The letter from Shorty to Robert, referring to Georgina's letter, is dated June 5, 1987. The jury convicted Robert on May 8, 1987.

[8] Georgina wrote, "[A]s far as my case is concerned, I really don't know what is going on except that I have to be at my husbands [sic] trial . . . to tell the court what happened. Then I go for sentencing . . . I am looking at 10 years and the judge said that I would have to do 6 years out of that. And depending upon my PSI check and my cooperation in the trial it could go a lot easier then [sic] that."

[9] State v. Tassin, 536 So.2d 402 (La. 1988).

claim that the State's suppression of the agreement between Georgina and the trial court violated the Fourteenth Amendment, as well as his other claims.

Following rejection of his application for writ of certiorari and review to the Louisiana Supreme Court,[10] Robert brought his first federal habeas petition arguing, inter alia, that the lower court's determination that no covered-up deal existed was an unreasonable application of federal law. While these claims were pending, Robert discovered new evidence,[11] and the State permitted Robert to bring a second State Application for Post Conviction Relief (the "successor petition") based on this evidence, which he filed in January 1997. The federal court dismissed his habeas claim without prejudice, and the state court considered the successor petition. The state court rejected the second petition for relief in November 1997. In January 2001, the state court rejected Robert's motion to reconsider its denial of the successor petition. That court did, however, permit additional scientific testing to determine whether Stagner initiated the violence on the night of the murder. In December 2003, the state court considered the results of the scientific testing and denied Robert's claims in his amended successor petition. Then the federal district court again addressed Robert's habeas claims.

Robert had presented evidence to the state court that Georgina expected to receive only ten years, not ninety-nine, in prison – including the letter that she wrote to a friend before the original trial, as well as post-conviction testimony of Georgina and her lawyer indicating that Georgina's attorney had discussed a deal with the court and had communicated this to Georgina.[12] The

---

[10] State ex rel. Tassin v. Whitely, 664 So.2d 419 (La. 1995).

[11] The evidence showed that the judge overseeing his trial was involved in a business with the elected District Attorney prosecuting Tassin's case.

[12] See supra notes 5 and 7.

state court concluded that Robert had failed to prove that such an arrangement existed and therefore denied Robert's habeas claim, stating,

> Tassin alleges that his wife, Georgina Tassin (Georgina) was promised a lenient sentence by the trial judge in return for her testimony against petitioner. Tassin further alleges that this arrangement was unknown to him. At the evidentiary hearing on this claim, the trial judge, Georgina, and Georgina's attorney all denied that such an arrangement was made. Robert Tassin presented no convincing evidence to contradict the testimony of these individuals. Accordingly, relief based on this claim is denied.

The district court granted relief on this issue, finding that the state habeas court had erroneously required Robert to show that the court had "promised" Georgina a lenient sentence and that this promise was unknown to Robert.[13] The district court held that the state court's ruling was "contrary to federal law because it applied a more stringent standard than the one established by Supreme Court precedent." Specifically, the district court found that the state court's determination was contrary to Giglio v. United States,[14] Napue v. Illinois,[15] and Brady v. Maryland[16] because the suppressed bargain need not have been a firm "promise" in order to mislead the jury with respect to Georgina's credibility, and because the State failed to disclose the bargain. The court found that the State was "Constitutionally required" to "reveal its deal with the witness to the jury"[17] and had failed to do so. The State appealed, arguing that the district court's holding was erroneous, urging that there was no "promise" and that Georgina's testimony was not misleading. Alternatively,

---

[13] Tassin v. Cain, 482 F. Supp. 2d 764, 773, 775 (E.D. La. 2007).

[14] 405 U.S. 150 (1972).

[15] 360 U.S. 264 (1959).

[16] 373 U.S. 83 (1963).

[17] 482 F.Supp. 2d at 771.

the State argues, even if Georgina's testimony was misleading, her testimony was not material. We address each argument in turn.

II

Robert Tassin filed his federal habeas petition on January 18, 2005, so AEDPA applies.[18] Under AEDPA, "The state court's factual findings are presumed to be correct, and the habeas petitioner has the burden of rebutting that presumption by clear and convincing evidence."[19] In reviewing a state trial court decision, a district court may grant a habeas writ only if the court's decision was contrary to or an unreasonable application of federal law or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[20]

> A state court decision is contrary to clearly established Supreme Court precedent if: (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."[21]

The federal district court presumed that the state court's findings of fact were correct but concluded that the state court's decision, holding that there was no due process violation under the Fourteenth Amendment, was contrary to

---

[18] Williams v. Cain, 125 F.3d 269, 274 (5th Cir. 1997) (holding that AEDPA applies to cases where the habeas petitioner files a federal application for habeas corpus on or after April 24, 1996, AEDPA's effective date). Tassin originally filed a federal habeas claim on April 23, 1996, before AEDPA was effective. The district court dismissed that claim without prejudice when Tassin discovered that the judge at his original trial had been in business with the district attorney prosecuting Tassin. Tassin exhausted his bias claim in state court, which the court rejected, and he then filed his second federal habeas petition.

[19] Coble v. Quarterman, 496 F.3d 430, 435 (5th Cir. 2007).

[20] 28 U.S.C. § 2254(d).

[21] Coble, 496 F.3d at 435 (quoting Williams v. Taylor, 529 U.S. 362, 406 (2000)).

clearly established federal law. The federal court correctly found that the state had erroneously concluded that there was no duty of disclosure absent a firm promise of leniency from the judge or prosecutor. We agree. It also concluded that there was an understanding sufficient to trigger Giglio and Brady, albeit not a "firm promise," that Georgina had expected to gain beneficial treatment in sentencing, provided she testified at trial consistently with her prior statements inculpating Robert. The court did not err in that conclusion. Finally, the federal court concluded that nondisclosure of the understandings violated Brady. We turn first to Giglio and then to Brady.

In Giglio, the petitioner discovered after his conviction that the Government had told a testifying witness that the witness "would definitely be prosecuted if he did not testify, and that if he did testify he would be obliged to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted."[22] Yet the testifying witness did not disclose this at trial. The witness testified as follows:

> Q. Were you ever arrested in this case or charged with anything in connection with these money orders that you testified to?
>
> A. Not at that particular time.
>
> Q. To this date, have you been charged with any crime?
>
> A. Not that I know of, unless they are still going to prosecute.[23]

The Government later argued to the jury that the testifying witness "received no promises that he would not be indicted."[24] The Court in Giglio found a Fourteenth Amendment violation and granted the petitioner a new trial,

---

[22] 405 U.S. at 153.

[23] Id. at 152.

[24] Id.

finding, "The heart of the matter is that one Assistant United States Attorney – the first one who dealt with [the testifying witness] – now states that he promised [the witness] that he would not be prosecuted if he cooperated with the Government."[25]

In Napue, the Court reversed a petitioner's conviction where an attorney had "promised" the key testifying witness consideration in exchange for his testimony, and the witness lied about this promise before the jury.[26] The witness, when the Assistant State's Attorney asked, "Did anybody give you a reward or promise you a reward for testifying?" replied, "There ain't nobody promised me anything."[27] The witness testified that he was sentenced to "One Hundred and Ninety-Nine Years" and that he hoped to have that sentence reduced. Even though the witness also testified that one attorney "talked to [him] a while ago and said he was going to do what he could" to reduce the sentence,[28] the Court found that this testimony did not sufficiently apprise the jury as to the witness's deal with the Assistant State's Attorney. Although the

---

[25] Id. at 153.

[26] 360 U.S. at 265.

[27] Id. at 267 n.2. (emphasis added). The witness testified as follows: "'Q. Did anybody give you a reward or promise you a reward for testifying?' 'A. There ain't nobody promised me anything. . . . [on redirect]' 'Q. [by the Assistant State's Attorney] Have I promised you that I would recommend any reduction of sentence to anybody?' 'A. You did not.'"

[28] The witness testified as follows: "'Q. [on cross-examination] And didn't you tell him [one of Napue's attorneys] that you wouldn't testify in this case unless you got some consideration for it?' 'A. . . . Yes, I did; I told him that. . . .' 'Q. What are you sentenced for?' 'A. One Hundred and Ninety-Nine Years.' 'Q. You hope to have that reduced, don't you?' 'A. Well, if anybody would help me or do anything for me, why certainly I would.' 'Q. Weren't you expecting that when you came here today?' 'A. There haven't no one told me anything, no more than the lawyer. The lawyer come in and talked to me a while ago and said he was going to do what he could.' 'Q. Which lawyer was that?' 'A. I don't know; it was a Public Defender. I don't see him in here.' 'Q. You mean he was from the Public Defender's office?' 'A. I imagine that is where he was from, I don't know.' 'Q. And he was the one who told you that?' 'A. Yes, he told me he was trying to get something did for me.' 'Q. . . . And he told you he was going to do something for you?' 'A. He said he was going to try to.'" Id. at 268 n.3.

Court referred to the covered-up deal as a "promise," the Court focused on the extent to which the testimony misled the jury, not whether the promise was indeed a promise, and emphasized that the witness "believed" that he "might" receive a promise prior to trial.[29] The Court found,

> Had the jury been apprised of the true facts . . . it might well have concluded that [the key witness] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which [the witness] was testifying, for [the witness] might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration.[30]

Giglio and Napue set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair. Although Giglio and Napue use the term "promise" in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception. A promise is unnecessary. Where, as here, the witness's credibility "was . . . an important issue in the case . . . evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."[31] As the Court held in U.S. v. Bagley, a case that informed the district court's decision,

> Defense counsel asked the prosecutor to disclose any inducements that had been made to witnesses, and the prosecutor failed to disclose that the possibility of a reward had been held out to [the witnesses] if the information they supplied led to "the accomplishment of the objective sought to be obtained . . . to the satisfaction of [the Government]." This possibility of a reward gave [the witnesses] a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or

---

[29] Id. at 270.

[30] Id.

[31] Giglio, 405 U.S. at 154-55 (emphasis added).

11

binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction.[32]

The Supreme Court emphasized in Giglio that "this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'"[33] and that "'the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'"[34]  Tassin presented evidence of an "understanding or agreement"[35] between Georgina Tassin and the State, evidence that showed more than a mere "hope or expectation" of a lenient sentence, and that the State failed to correct Georgina's testimony that no agreement existed.  The district court pointed to multiple pieces of supporting evidence; we highlight a few.

Georgina's attorney testified after trial that he believed, prior to trial, that Georgina would get a ten-year sentence if she testified consistently with her prior statements inculpating Robert and he relayed this belief to her, although emphasizing that nothing was guaranteed.  Her attorney recalled meetings with the judge where the possibility of a ten-year sentence was discussed.  According to the attorney's affidavit, the judge stated that he typically gave defendants in Georgina's position a fifteen- to thirty-year sentence[36] but that he might shorten

---

[32] 473 U.S. 667, 683 (1985) (opinion of Blackmun, J., joined by O'Connor, J.) (emphasis added).

[33] 405 U.S. at 153 (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)).

[34] Id. (quoting Napue, 360 U.S. at 269).

[35] 405 U.S. at 154.

[36] One of Pastor's affidavits indicated that the judge typically gave fifteen to twenty years for defendants similar to Georgina's; Pastor at another point testified that the number was twenty to thirty years.

that sentence to ten years if she testified consistently. Georgina relayed her belief in this deal in her pre-trial letter to her friend Shorty, stating, "I am looking at 10 years and the judge said that I would have to do 6 years out of that." Yet at trial, Georgina testified that she might receive ninety-nine years in prison and that she didn't know whether her testimony would "have any bearing" on her sentence. Most importantly, the district attorney capitalized on this misrepresentation in his closing argument, stating, "She faces up to ninety-nine years in jail for armed robbery. . . . So she has no reason to lie to anybody. . . . You call five to ninety-nine years a deal?" The State not only allowed deceptive testimony to go uncorrected; it also capitalized on its key witness's testimony to argue that there were no pending agreements affecting her credibility.

In light of the Supreme Court's holdings in Giglio, Napue, and Bagley, the district court did not err in concluding that the trial court's decision, in holding that a Fourteenth Amendment violation required Tassin to show that the state had made a "promise" to his wife in exchange for her testimony and covered up this promise, was contrary to clearly established federal law.

### III

The State argues that even if Georgina's testimony was misleading, any Fourteenth Amendment violation resulting from the State's failure to disclose the understanding between Georgina and the State was not material. As a result, it urges, the district court erred in finding that the trial court's holding was contrary to Brady v. Maryland, as well as to Napue and Giglio.[37]

---

[37] The district court held that the "State Court Applied a Standard Contrary to Brady," finding, "the State's understanding with Georgina Tassin, while perhaps not a firm promise, nevertheless clearly falls within the scope of the Brady rule. The State was constitutionally required to reveal its deal with the witness to the jury." 482 F.Supp. 2d at 771.

The district court, in holding that the state trial court's decision was contrary to federal law, found that the State's failure to reveal Georgina's sentencing deal was material because there was "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Georgina's deal need not have been a "firm promise" to trigger Brady, it held. This holding was not erroneous.

Under Brady,

suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule.[38]

It is true that "[w]e do not . . . automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .' A finding of materiality of the evidence is required under Brady."[39] When the question of materiality arises, "a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'"[40]

The State argues that Georgina's testimony that the Tassins planned to commit a felony – armed robbery – was not the only testimony supporting Robert Tassin's death penalty conviction: Stagner's and the forensic examiner's testimony support the jury's finding on two other aggravating factors – knowing creation of "a risk of death or great bodily harm" and committing an offense "in a heinous, atrocious or cruel manner." The fact that other evidence could have

---

[38] Giglio, 405 U.S. at 153-54 (citations omitted) (quoting Brady, 373 U.S. at 87; Napue, 360 U.S. at 269).

[39] Id. at 154 (quoting United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968)).

[40] Id. (quoting Napue, 360 U.S. at 271).

supported two aggravating factors underlying Robert's capital conviction fails to address the question of the gravity of the false testimony at issue and how the State's failure to reveal the existence of a sentencing deal underlying that false testimony affected the jury's conclusions. As the Supreme Court held in Kyles v. Whitley,

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.[41]

The State's theory of the case was that when Sheila Mills went into the Tassins' home to ask about drugs while Stagner and Martin waited in the car, Mills and the Tassins planned an armed robbery of Stagner and Martin. The jury found Tassin guilty of first-degree murder "committed in the course of an armed robbery"; Georgina's testimony was crucial to this finding. Because Mills did not testify and Robert insisted that he did not plan any robbery, Georgina was the key witness – and the only witness – behind the State's felony murder case. Her credibility was material; if the jury had known of Georgina's sentencing deal, there is a reasonable likelihood that they may have chosen to believe Robert's story over his wife's. There is also a reasonable likelihood that the State's remaining theories of the case, based on the other aggravating factors, would have been too weak to stand independently.

The State claims that even absent Georgina's testimony, the outcome of the trial would have been the same, since Stagner's and the forensic examiner's testimony showed the heinous nature of the crime and knowing creation of risk, the two other aggravating factors found by the jury. The jury had reason to

---

[41] 514 U.S. 419, 434-35 (1995).

disbelieve Stagner; he originally told the police that hitchhikers had shot Stagner and Martin. And evidence presented by a non-eyewitness forensic examiner may not, by itself, have convinced the jury of the existence of the aggravating factors. Regardless of the strength of the evidence presented by Stagner and the examiner, the central issue in the Brady analysis is how the evidence of Georgina's favorable sentencing deal would have affected the case as a whole. As the district court found, quoting Napue,

> The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.[42]

The jury was not informed of a beneficial sentencing agreement that hinged directly on Georgina's testimony, and Georgina was central to the State's case. The State not only failed to correct Georgina's misleading testimony with respect to that deal but capitalized on that testimony, arguing to the jury that Georgina had no reason to lie.[43] This is a Fourteenth Amendment violation under the clear precedent of Giglio, Napue, and Brady, as the district court held.

AFFIRMED.

---

[42] 482 F.Supp. 2d at 774 (quoting Napue, 360 U.S. at 269).

[43] The State also argues, under Fry v. Pliler, 127 S. Ct. 2321 (2007), and Brecht v. Abrahamson, 507 U.S. 619 (1993), that we should reverse or remand to the district court to determine whether the introduction of Georgina's testimony was prejudicial or constituted harmless error under Brecht's deferential standard. Because the district court held that the Brady error was material, and we affirm this holding, we need not apply harmless error analysis. See Kyles, 514 U.S. at 435.