**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 29, 2011

Lyle W. Cayce
Clerk

No. 08-30477

PRINCESS P. LACAZE,

Petitioner-Appellant,

v.

WARDEN LOUISIANA CORRECTIONAL INSTITUTE FOR WOMEN,
also known as Mariana Leger,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

Before SMITH, WIENER, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Princess P. LaCaze (hereinafter "LaCaze"), Louisiana prisoner # 403264, was convicted in state court of second-degree murder and sentenced to life imprisonment. LaCaze filed a habeas petition in federal district court pursuant to 28 U.S.C. § 2254, which was denied. This court then granted a certificate of appealability on two issues: first, whether the State withheld *Brady* material concerning a promise made to LaCaze's co-defendant, *see Brady v. Maryland*, 373 U.S. 83 (1963), and second, whether the trial court unconstitutionally denied

1

No. 08-30477

her an impartial jury, *see Ross v. Oklahoma*, 487 U.S. 81 (1988). We REVERSE and REMAND with instructions to grant the writ.

## I.

Meryland Robinson, a long-time friend of the victim, was driven by his fourteen-year-old son to the home of Michael LaCaze (hereinafter "Michael LaCaze") in Natchitoches Parish, Louisiana under the guise of returning a gun that Robinson had borrowed. Robinson shot Michael LaCaze through the shoulder, killing him. After the shooting, Robinson tossed items from the victim's desk onto the floor to make it look like a botched robbery. Princess LaCaze, the victim's wife, was not home at the time of the shooting.

Although LaCaze initially denied any knowledge regarding her husband's death, she later told the police that he may have arranged his own death due to his failing kidneys. She admitted that she knew beforehand that Robinson planned to kill her husband. Michael LaCaze had previously told her he would never be dependent on a machine to stay alive, and was scheduled to begin dialysis within days of the murder. Still later, she admitted that she had called Robinson the day of the murder, and he told her that "it would be taken care of that day" and not to return to her home until seven o'clock that evening. She also admitted that she had been having an extramarital relationship with Robinson at the time of the shooting, but again maintained that Michael LaCaze had sought Robinson's help in ending his life due to his declining health.

Soon after Robinson killed Michael LaCaze, LaCaze began seeing another man. It was only after LaCaze had Robinson arrested for knocking on the wall of her house at night that Robinson made a statement implicating LaCaze, contrary to his prior repeated denials of her involvement. Based on his

No. 08-30477

statement, both parties were indicted in January 1998 for second-degree murder.

Prior to trial, LaCaze filed a motion for discovery of any evidence "which in any way and to any extent" was favorable to her, specifically including "the existence and substance of any and all agreements or understandings, assurances or representations, formal or informal, oral or written, confected between the prosecution and any and all persons involved in the case in any manner." The State responded that Robinson had agreed to testify at LaCaze's trial in exchange for the reduction of his charge from second-degree murder to manslaughter and a sentence of forty years' imprisonment. The State maintained that it knew of "no direct exculpatory evidence," but provided as potentially favorable evidence that Robinson initially denied involvement in the crime and gave an alibi to a deputy. The State never disclosed, however, that it had assured Robinson that his son would not be prosecuted if he agreed to make a statement implicating LaCaze.

Pursuant to his plea agreement, Robinson testified at LaCaze's trial. Robinson and Michael LaCaze had been friends for over twenty years. Robinson became close to Princess LaCaze through his friendship with her husband, and eventually, they began having an extramarital affair. Robinson testified that LaCaze told him that Michael LaCaze treated her badly. He explained that, when he began his involvement with LaCaze, "nothing else mattered"; he "couldn't do nothing else but focus on her and she . . . just meant everything."

Robinson then testified that LaCaze asked him if he knew anyone who would kill her husband, and he told her he would ask around. Finally, he agreed to do it himself. Telephone records reflect that she called him from a pay phone the morning of the shooting. Robinson testified that the purpose of that call was

3

to confirm the plan and to coordinate when she should come home. Later that day, Robinson went with his son, Rodney Robinson, to the LaCazes' house. He knocked on the door, greeted Michael LaCaze, and went back to his car to retrieve his gun. Upon returning to the house, Robinson shot him from the doorway.

Robinson admitted that Michael LaCaze had told him he would not go on dialysis and had asked him to end his life about one year before the murder. He also testified that he had witnessed him tell LaCaze that he did not want to have surgery. In fact, another witness, Glenda Froreich, testified that Michael LaCaze had told her five or six months prior to his death that he definitely did not want medical attention to help him live longer. He mentioned suicide, and he and Froreich discussed Froreich's own attempted suicide by overdosing on pills. He told her he did not plan to do it that way. Nonetheless, Robinson testified that the real reason he killed Michael LaCaze was because LaCaze had requested that he do so.

A few days after the murder, Robinson cut up the gun and scattered it around town, throwing a piece of it in the river, which he told LaCaze. The man LaCaze began dating shortly after Michael LaCaze's death testified that LaCaze told him she "wished [the police] would leave her alone," because the "gun was in the river."

In its opening statement, the State told the jury that Robinson was the most important part of its case. It asked that the jury find him credible, explaining, "there may be some talk and there was probably some talk about deals and he's lying because he got a deal, well as far as I'm concerned, folks, forty years and being seventy something years old before you get out of jail is a

No. 08-30477

life sentence.  And he's doing time."  The prosecutor then previewed the most important parts of Robinson's testimony, including that LaCaze frequently asked Robinson to kill her husband and that LaCaze knew that Robinson had cut up the gun and thrown it in the river.  In closing argument, the State again emphasized Robinson's credibility, saying he had "never seen anybody pour the truth out from their soul like I saw him and you saw it too."  After the defense emphasized Robinson's sentencing agreement during its closing argument, the State reiterated on rebuttal that Robinson would not have lied to obtain his forty-year plea agreement, which was basically a life sentence.  The prosecutor said, "It's really the rest of his natural life.  And that's the earliest he'll get out.  He may be seventy-six if he lives that long before he gets out.  So when [the defense] talks about [us] cutting a deal with him, that ain't much of a deal.  That ain't much of a deal."

The jury found Princess LaCaze guilty of second-degree murder based on a finding of "specific intent," which required a showing that "the circumstances indicate that the offender actively desired the prescribed criminal consequence to follow from her act or failure to act."  She subsequently received a mandatory sentence of life imprisonment without the possibility of probation, parole, or suspension of sentence.  *State v. LaCaze*, 759 So. 2d 773, 776 (La. App. 3d Cir. 1999).  On direct appeal, the Louisiana Third Circuit Court of Appeal affirmed her conviction, *id.* at 789, and the Louisiana Supreme Court denied her writ of certiorari, *State v. LaCaze*, 770 So. 2d 359 (La. 2000).

LaCaze then sought post-conviction relief in state court based on the undisclosed understanding between the prosecutor and Robinson.  The trial court denied her request, finding that the assurance Robinson received from the

5

No. 08-30477

prosecutor was immaterial, but the Louisiana Third Circuit Court of Appeal remanded the case for an evidentiary hearing.

The trial court held two evidentiary hearings. At the first hearing, Robinson's attorney, Mike Bonnette, testified that he sought certain assurances prior to Robinson's giving his statement to the police. Bonnette was "concerned" about Robinson's statement "because there was a possibility of him implicating his son." So, before Robinson gave his statement, he received assurances from Danny Hall, an investigator with the district attorney's office, that his son would not be prosecuted. LaCaze's trial attorney then testified that, although he requested all such information, the State never disclosed that assurance. Had he known about the assurance, he said, he "certainly would have tried to cross-examine him on that and I would have felt that it was relevant." Later, Hall testified that, although he remembered meeting with Robinson and Bonnette, he could not remember what was said but did remember that he did not make any assurance to Robinson. At the second evidentiary hearing, Robinson testified that, before he agreed to give a statement, he asked Danny Hall "over and over again" that his son not be prosecuted. He testified that he probably would not have given a statement without the assurance that his son would not be prosecuted.

The Louisiana trial court concluded that "the evidentiary hearing testimony proves without doubt to this Court that while the 14 year old son of Meryland Robinson did in fact drive his father to and from the home of the murdered victim," the son had no part in the planning of and did not participate in the murder, so "[t]here was nothing for the prosecutor to pin any hope of conviction on even if charges were in fact brought against the youngster." The

No. 08-30477

trial court further found, however, that "Meryland Robinson did express his concern as to whether his 14 year old son would be arrested. He was assured that his son would not be arrested." Nonetheless, the trial court found that "there was no written 'deal'" concerning Robinson's son. The court also found that Robinson agreed to testify because of his agreement to plead guilty to manslaughter, not because of the assurance he received related to his son. The trial court denied relief because "[t]he totality of the evidence [was] so overwhelming in favor of the finding of guilty by the jury that the evidence relating to the 14 year old young man is irrelevant."

LaCaze appealed that decision to the Louisiana Third Circuit Court of Appeal, which ruled that the trial court erred in denying her application for post-conviction relief and remanded the case for a new trial. The Louisiana Supreme Court reversed in a two-paragraph, per curiam opinion, with two judges noting that they "would grant [the writ] and docket." *State v. LaCaze*, 947 So. 2d 716, 717 (La. 2007). The court observed that "[t]he undisclosed revelation that the state's main witness, [LaCaze's] former extramarital lover, sought protection for his young son from criminal charges arising out of the same incident before he made a statement to the police was relevant to the witness's credibility as a possible motive for his testimony as a state witness at trial." *Id*.

The Louisiana Supreme Court concluded, however, that LaCaze had not satisfied the third element of the *Brady* analysis, materiality, for two reasons: first, because Robinson's agreement to plead guilty to manslaughter for a lesser sentence was revealed to the jury, along with his criminal record, and second, because his testimony was corroborated. *Id*. The court pointed to the testimony of LaCaze's new boyfriend, which the court characterized as testimony that

7

No. 08-30477

LaCaze "told him she would evade charges because the murder weapon was unrecoverable," and to the defendant's admission that she had discussed her husband's alleged death wish with Robinson and knew Robinson planned "to take care of it." *Id.* The court reinstated the defendant's conviction and sentence.

After being denied post-conviction relief by the Louisiana Supreme Court, LaCaze sought habeas relief pursuant to 28 U.S.C. § 2254 in federal district court, raising twenty-one grounds for relief. Without holding a hearing, the magistrate judge recommended that the district court deny the writ. With regard to the *Brady* claim, the magistrate judge stated that, "[w]eighed against his criminal history alone, the fact that Robinson sought assurances from the State that his son would not be prosecuted before he gave a statement to the police becomes much more significant." *LaCaze v. Leger*, No. 07-CV-0236, 2008 WL 1836374, at *6 (W.D. La. April 03, 2008). The magistrate judge nonetheless determined that the assurance was not material because LaCaze "knew, from pretrial discovery, that Robinson had pleaded guilty to the reduced charge of manslaughter and a forty year sentence," yet "she did not use that evidence to impeach Robinson at trial." *Id.* Had that plea agreement been revealed to the jury, it would have rendered immaterial the non-disclosure of the assurance shielding Robinson's son from prosecution because that information would have been "essentially cumulative and not material." *Id.*

In a short, one-page order, the district court adopted the magistrate judge's report and recommendation, dismissed the petition with prejudice, and denied a certificate of appealability. This court then granted a certificate of appealability on two issues: (1) whether the State withheld *Brady* material

No. 08-30477

concerning her co-defendant, and (2) whether the trial court unconstitutionally denied her an impartial jury.

## II.

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) provides that a federal court may not grant habeas relief after adjudication of a claim in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Clearly established federal law comprises "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to federal law when it "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.* at 413, or where it "extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *id.* at 407. Thus, under AEDPA's standard of review, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

We review the state court's "ultimate decision" for unreasonableness. *Charles v. Thaler*, 629 F.3d 494, 501 (5th Cir. 2011). Here, we review the

No. 08-30477

Louisiana Supreme Court's decision, *see id.*, giving deference to the Louisiana trial court's factual findings, *see Moody v. Quarterman*, 476 F.3d 260, 267-68 (5th Cir. 2007).  Although we review only the ultimate legal determination by the Louisiana Supreme Court and not whether the court provided exhaustive reasoning to support the result, "a thorough and well-reasoned state court opinion may be more likely to be correct and to withstand judicial review . . . ." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (per curiam) (en banc).

### III.

To show that the state court's proceeding resulted in a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d)(1), LaCaze must show that the prosecution's failure to disclose requested impeachment evidence constituted a violation of due process pursuant to *Brady*, 373 U.S. at 87, and that the state court's application of *Brady* was unreasonable. *See Mahler v. Kaylo*, 537 F.3d 494, 499 (5th Cir. 2008). LaCaze must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material. *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994).

### A.

The Louisiana trial court found that the prosecution had suppressed evidence favorable to LaCaze, satisfying the first and second prongs of the *Brady* analysis.  Specifically, following an evidentiary hearing, the trial court found that Robinson "did in fact voice his concern in the investigative stage of the case about his son being prosecuted" and "was assured that his son would not be arrested."  Those facts were accepted on appeal.  Although the Louisiana Third Circuit Court of Appeal reversed the trial court's denial of the writ, it agreed with the trial court's findings, saying that "the State failed to disclose information concerning the plea arrangement made with a critical witness."

No. 08-30477

*State v. LaCaze*, KW 05-01170 (La. App. 3 Cir. 2/6/06). The Louisiana Supreme Court, while reinstating the defendant's conviction, stated that the prosecution failed to disclose that "the state's main witness, [LaCaze's] extramarital lover, sought protection for his young son from criminal charges arising out of the same incident before he made a statement to the police," which was "relevant to the witness's credibility as a possible motive for his testimony as a state witness at trial." *LaCaze*, 947 So. 2d at 717. We defer to the trial court's findings, which were accepted by both appellate courts, as we must under AEDPA. *See Moody*, 476 F.3d at 267-68.

Notwithstanding those findings, the State now contends that the evidence did not need to be disclosed because Robinson and the district attorney never actually reached a "deal." However, the Supreme Court has never limited a *Brady* violation to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal. In *Napue v. Illinois*, 360 U.S. 264, 270 (1959), the Supreme Court explained that the key question is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness "might have believed that [the state] was in a position to implement . . . any promise of consideration." *Id.*; *see Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) ("A promise is unnecessary."). In fact, "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility." *Giglio*, 405 U.S. at 155. The question is "the extent to which the testimony misled the jury, not whether the promise was indeed a promise . . . ." *Tassin*, 517 F.3d at 778 (citing *Napue*, 360 U.S. at 270).

Here, Robinson testified that he "asked . . . over and over again" that his son not be prosecuted, that the prosecutor gave him an assurance that he would not be, and that Robinson believed him. Indeed, Robinson testified that he

No. 08-30477

probably would not have given his statement implicating LaCaze if he had not received such an assurance. Robinson's attorney corroborated Robinson's testimony, saying that he had "an understanding" with the prosecutor. Thus, the evidence demonstrates that the assurance impacted Robinson's decision to implicate LaCaze, regardless of whether there was any possibility Robinson's son would have been prosecuted without that assurance. The prosecution had a duty to disclose it.

## B.

We now consider the question of materiality. Whether evidence is material, for purposes of a *Brady* violation, is a mixed question of law and fact, which we review de novo. *Mahler*, 537 F.3d at 500. We review the Louisiana Supreme Court's holding to determine whether "the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); *see Moody*, 476 F.3d at 267. The Louisiana Supreme Court concluded that the failure to disclose the assurance was immaterial because Robinson's agreement to plead guilty to manslaughter for a lesser sentence was revealed to the jury, and because his testimony was corroborated by other evidence.

"[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435; *see also Tassin*, 517 F.3d at 780. Or, put another way, whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence" in the absence of the favorable evidence. *Kyles*, 514 U.S at 434. "The materiality of *Brady* material depends

almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (quoting *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (internal quotation marks omitted)). A *Brady* violation is more likely to occur when the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration." *Id.* at 397.

The State primarily argues that the undisclosed agreement regarding Robinson's son was immaterial because Robinson's sentencing agreement, pursuant to which he pleaded guilty to manslaughter and received a forty-year sentence, was disclosed to the jury. Despite its determination that the non-disclosure was relevant as a possible motive to lie, the Louisiana Supreme Court accepted this argument, finding that it was immaterial because the "main source" of Robinson's bias and motivation to lie, his plea agreement, had been disclosed. However, this is not the proper legal standard. The materiality inquiry does not turn on which of two competing sources of bias a court, in hindsight, determines the jury would have considered more important. Rather, the inquiry is whether an undisclosed source of bias—even if it is not the only source or even the "main source"—could reasonably be taken to put the whole case in a different light. *Kyles*, 514 U.S. at 434-35. The Louisiana Supreme Court neither cited nor applied that standard.

Moreover, in *Napue*, 360 U.S. at 270, the United States Supreme Court made clear that an undisclosed source of bias can be material even if it is not the main source of bias. There, the jury knew that "someone whom [the witness] had tentatively identified as being a public defender" had promised "to do what he could" to reduce the witness's sentence, but was not told that *the prosecutor* had promised the same thing. *Id.* at 268, 270. The Court rejected the idea that "the fact that the jury was apprised of other grounds for believing that the

witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." *Id.* at 270; *see also Tassin*, 517 F.3d at 780 (holding that the jury's knowledge of other aggravating factors justifying the death sentence did not render the failure to disclose exculpatory evidence as to the other factor immaterial). Likewise, here, the argument that relief should be denied simply because the jury knew one of two completely unrelated bases for Robinson to lie cannot be sustained under the Supreme Court's precedent in *Kyles* and *Napue*.

Therefore, applying both AEDPA and *Kyles*, we must consider whether there was some other reason why the suppressed information was not material. At trial, the parties did not dispute that Robinson killed Michael LaCaze. Nor did they dispute that LaCaze knew in advance that Robinson planned to kill him. Rather, what the two sides contested, and what was integral to LaCaze's defense, was whether she *intended* for Robinson to kill him. Importantly, Robinson's testimony provided the only direct evidence of that intent, as the other member of an alleged two-member conspiracy.[1]

---

[1] Moreover, as in *Tassin*, the State here "capitalized on this misrepresentation in [its] closing argument" by repeatedly arguing that Robinson had not received a deal that would give him a reason to lie—which itself shows the materiality of the undisclosed deal. *See Tassin*, 517 F.3d at 779. In its opening statement, the State told the jury Robinson was critical to its case. It asked that the jury find him credible, arguing that Robinson's agreement was a de facto life sentence and therefore not worth lying to obtain: "There may be some talk and there was probably some talk about deals and he's lying because he got a deal, well as far as I'm concerned, folks, forty years and being seventy something years old before you get out of jail is a life sentence. And he's doing time." In its closing argument, the State emphasized Robinson's credibility, saying he had "never seen anybody pour the truth out from their soul like I saw him and you saw it too," and then again called Robinson's sentencing agreement basically a life sentence on rebuttal. The State's argument that an unrevealed deal is immaterial after going to such lengths to emphasize Robinson's credibility and lack of any motives for lying at trial simply lacks force.

No. 08-30477

In determining that the *Brady* evidence was not material, the Louisiana Supreme Court then held that there was sufficient other evidence to support LaCaze's conviction, specifically her statement about the gun's being in the river and her admitted knowledge of Robinson's intent to kill her husband, which rendered the failure to disclose immaterial. *LaCaze*, 947 So. 2d at 717. Again, the court used the wrong standard. *See Kyles*, 514 U.S. at 435 n.8. "[I]t is not a sufficiency of evidence test." *Id.* at 434. Rather, the state court must consider whether the undisclosed agreement "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[2] *Id.* at 435. Using that standard, the undisclosed assurance, which the court held was "relevant" and "a possible motive" for his testimony, *LaCaze*, 947 So. 2d at 717, was material.

Robinson's testimony was the only direct evidence presented by the State to show a critical element: LaCaze's intent to have her husband killed. LaCaze's own statements—particularly those in which she admitted she knew Robinson intended to kill her husband and did nothing to stop it—are damaging, but they do not establish the requisite *mens rea* to commit the crime. Knowledge does not equal intent. *See State v. Wiley*, 672 So. 2d 185, 187-88 (La. App. 3d Cir. 1996). In fact, LaCaze's statements were consistent with her defense at trial that Michael LaCaze requested that Robinson kill him, which she admitted she knew. Further, the testimony by LaCaze's new boyfriend did not establish her intent,

---

[2] Although its analysis more closely approximated a sufficiency of the evidence standard, the Louisiana Supreme Court stated the standard as follows: "Evidence is material [and reversal warranted] only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome." But even that standard, which requires that the evidence *probably* undermined the result, is not the same as the lesser standard in *Kyles*, which requires only that the evidence *could have* undermined the result.

as the court determined.  After-the-fact acknowledgment that she knew where the murderer hid the murder weapon does not establish her specific intent.  *See id.*

This case bears a striking resemblance to *Tassin*, 517 F.3d at 780, in which this court granted habeas relief based on a *Brady* violation.  There, as here, the government's key witness—the only witness testifying to the defendant's intent—had received "an understanding" of leniency that the prosecution failed to disclose.  *Id.* at 779-80.  The government's theory of the case was that Georgina and Robert Tassin had conspired to commit armed robbery and had killed the victim in the course of the robbery.  As the only other member of the two-member conspiracy, Georgina's testimony was "crucial" to the jury's finding that Robert had intended to commit armed robbery.  If the jury had known of the prosecutor's assurance that it would seek a favorable sentence for Georgina, it "may have chosen to believe Robert's story over [Georgina's]."  *Id.* at 780-81.  Indeed, the court found it "most important[]" that the state capitalized on the non-disclosure when it argued to the jury that the witness had no reason to lie.  *Id.* at 779.  Given the absence of evidence supporting the government's theory of the case and corroborating Georgina's testimony, the court found that the non-disclosure was material and granted the writ.

Likewise, here, Robinson's testimony was the only direct evidence of LaCaze's intent, and disclosure of his bias to the jury might have put the whole case in a different light.  In its opening statement, closing argument, and rebuttal, the State argued that Robinson had no reason to lie.  In circumstances like these, where "the jury's estimate of the truthfulness and reliability of [the witness] may well be determinative of guilt or innocence," the failure to disclose *Brady* information is material.  *Napue*, 360 U.S. at 269; *see also Mahler*, 537

No. 08-30477

F.3d at 503.  As in *Tassin*, the state court's determination to the contrary was an unreasonable application of clearly established federal law.

## IV.

This case raises a reasonable probability that disclosure of the agreement between the prosecution and Robinson would have produced a different result. *Kyles*, 514 U.S. at 435.  Based on our disposition of LaCaze's *Brady* claim, we need not consider the merits of her claim pursuant to *Ross v. Oklahoma*, 487 U.S. 81 (1988).  We reverse and remand with instruction to grant the writ under whatever conditions the district court may set.

REVERSED and REMANDED.