WR-56,666-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/8/2015 10:29:50 AM
Accepted 12/8/2015 11:04:13 AM
ABEL ACOSTA
CLERK

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS    2015 DEC -8  AM 9: 26
AUSTIN, TEXAS

FILED

RECEIVED
COURT OF CRIMINAL APPEALS
DALLAS  12/8/2015
ABEL ACOSTA, CLERK

| | | |
|---|---|---|
| EX PARTE | § | |
| | § | |
| | § | NO. WR-56,666-03 |
| | § | |
| DENNIS LEE ALLEN | § | |

CAUSE NO. F00-01305-R
WRIT NO. W00-01305-FR(B)

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | 265TH JUDICIAL DISTRICT |
| | § | |
| DENNIS LEE ALLEN | § | DALLAS COUNTY, TEXAS |

## APPLICANT'S OBJECTIONS TO TRIAL COURT'S SUPPLEMENTAL FINDINGS OF FACT IN RESPONSE TO REMAND ORDER

GARY A. UDASHEN
Bar Card No. 20369590

BRUCE ANTON
Bar Card No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax
Appearing on Behalf of the
Innocence Project of Texas

*Counsel for Dennis Lee Allen*

# TABLE OF CONTENTS

**Page**

Table of Contents ........................................... i

Index of Authorities ......................................... ii

I.      Introduction ...........................................

         a.      Summary of Case .................................. 2-3

         b.      Procedural History ............................... 3-4

II.     Factual Summary .................................... 4-27

III.    Judge Stoltz's Findings ............................ 27-28

IV.    Judge Hawthorne's Findings ......................... 28-29

V.     Legal Questions Before Court ....................... 29-31

VI.    The Role of the Court of Criminal Appeals in Deciding
The Writ Issue ..................................... 31-32

VII.    Jackson's Failure to Correct False Testimony ....... 33-34

VIII. Judge Hawthorne's Fact Findings Are Not Supported By
The Record ......................................... 34-45

IX.    Legal Authority .................................... 45-48

X.     Jackson's Discussions With Informants .............. 48-52

Conclusion ................................................ 52-54

Certificate of Service .................................... 54

Certificate of Compliance ................................. 55

# INDEX OF AUTHORITIES

**Cases**                                                                    **Page**

*Burkhalter v. State*, 493 S.W.2d 214 (Tex. Crim. App. 1973) . . . . . . . . . . . . . 48

*Brady v. Maryland*, 373 U.S. 87 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*Duggan v. State*, 778 S.W.2d 465 (Tex. Crim. App. 1989) . . . . . . . . . . . . . 46, 48

*Ex parte Adams*, 768 S.W.3d 281 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . 33

*Ex parte Harleston*, 431 S.W.3d 67 (Tex. Crim. App. 2014) . . . . . . . . . . . . . . 32

*Ex parte Navarijo*, 433 S.W.3d 558 (Tex. Crim. App. 2014) . . . . . . . . . . . . . . 31

*King v. State*, 189 S.W.3d 347 (Tex. App. - Fort Worth 2006, *no pet.*) . . . . . . . . 44

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Lacaze v. Warden Louisiana Correction Institute for Women*,
645 F.3d 728 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

*Mumphrey v. State*, 774 S.W.2d 75 (Tex. App. - Beaumont 1989, *pet. ref'd*) . . 44

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . 46

*United States v. Moore*, 522 F.2d 1068 (9th Cir. 1975),
*cert. denied* 423 U.S. 1049 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# IN THE COURT OF CRIMINAL APPEALS
## FOR THE STATE OF TEXAS
## AUSTIN, TEXAS

EX PARTE

§
§
§    NO. WR-56,666-03
§

DENNIS LEE ALLEN

§
§

CAUSE NO. F00-01305-R
WRIT NO. W00-01305-FR(B)

EX PARTE

§    IN THE DISTRICT COURT
§
§    265TH JUDICIAL DISTRICT
§

DENNIS LEE ALLEN

§    DALLAS COUNTY, TEXAS

## APPLICANT'S OBJECTIONS TO TRIAL COURT'S SUPPLEMENTAL FINDINGS OF FACT IN RESPONSE TO REMAND ORDER

**TO THE HONORABLE JUDGES OF SAID COURT:**

**NOW COMES** DENNIS LEE ALLEN, Applicant herein, and submits these

Objections to the Trial Court's Supplemental Findings of Fact In Response to

Remand Order and would show the following:

# I.

## Introduction

### a.    Summary of Case

This is a case about the suppression of exculpatory evidence regarding agreements, deals and understandings between the State and informants and jailhouse snitches. These informants and jailhouse snitches were the crux of the case against Allen and a jury properly informed of their true motives for testifying would, in all likelihood, have found Allen not guilty.[1] In this case, the prosecutor presented as witnesses multiple informants and jailhouse snitches who had been given reason to believe that the prosecutor would help them with their cases after they testified.[2] Additionally, the State presented two witnesses who the police detective had already helped with their own criminal problems. Nevertheless, the prosecutor made no disclosure of this to defense counsel, and presented testimony from each of these witnesses that they had received no promises and had been given no expectations of leniency or help from the State.

---

[1]*See*, Writ Ex. 1, "Beyond Unreliable: How Snitches Contribute to Wrongful Convictions," Natapoff, p. 109 ("Nearly fifty percent of wrongful murder convictions involved perjury by someone such as a jailhouse snitch or another witness who stood to gain from the false testimony."); Writ Ex. 2, "Abolishing Jailhouse Snitch Testimony," Covey, p. 103 ("According to some wrongful conviction scholars, jailhouse snitch testimony is the single greatest cause of wrongful convictions.").

[2]The two primary jailhouse snitches who testified against Allen - Lonel Hardeman and John Paul Robinson - have admitted, under questioning by the Dallas County District Attorney's Office Conviction Integrity Unit, that their testimony at trial was false and that Allen never told them he was involved in this murder case.

In an unusual twist, two of these informants actually wrote letters to the prosecutor confirming their understanding with the prosecutor as to what he would do to help them. These letters were received by the prosecutor before this trial, yet were never revealed to defense counsel.

In a further twist, one of these witnesses, under questioning by both the prosecutor and defense counsel, adamantly denied having any discussions with the State concerning help on his case. This false testimony was directly contradicted by these letters, but the prosecutor did not correct his testimony or notify the court of its falsity.

## b.    Procedural History

Allen filed his initial writ application on September 11, 2014, raising multiple grounds for relief. Subsequently, the State agreed that the prosecutor at trial had suppressed exculpatory evidence in both Allen's trial, as well as the trial of his co-defendant, Stanley Orson Mozee. The State and Allen and Mozee presented their agreed findings to the trial court and on October 28, 2014, after review of the evidence and arguments, the trial court agreed that the prosecution suppressed exculpatory evidence and entered Findings of Fact and Conclusions of Law so stating. The parties, and the trial court, agreed to defer any action on the remaining grounds for relief.

On February 4, 2015, the Court of Criminal Appeals issued a remand order

stating,

> "The trial court shall provide the trial prosecutor with the opportunity to respond to Applicant's *Brady* claim."

The trial court was further ordered to issue supplemental findings of fact and conclusions of law.

Upon receiving the remand order, the Judge of the 265th Judicial District Court, Judge Jennifer Bennett, recused herself from hearing this case. The original findings in this case were made by Judge Mark Stoltz, who was at that time Judge of the 265th Judicial District Court, who left office at the end of 2014. Following Judge Bennett's recusal, Judge Teresa Hawthorne, Judge of the 203rd Judicial District Court, was assigned to preside over the cases.

On October 26-27, 2015, an evidentiary hearing was held at which testimony from the trial prosecutor was heard. Additional evidence was also presented. On November 10, 2015, Judge Hawthorne issued the court's Findings of Fact on Remand.

## II.

## Factual Summary

Dennis Allen, along with Stanley Mozee, was charged with the capital murder of Jesse Borns. The case against Allen, as well as Mozee, was based largely on testimony from criminal informants, some of whom were in jail, and others on

probation.[3] In Allen's trial, the State presented testimony from the following criminal informants:

Lonel Hardeman

Zane Smith

John Paul Robinson

Alvin Degraftenreed

Charles Manning

Cynthia Sloan

Kenneth Jones

These witnesses, under questioning from prosecutor Rick Jackson,[4] denied having been offered, having discussions, or having any expectation of leniency or help on their own cases from the State. Yet, the record shows that the prosecutor and police detective helped these criminal witnesses, both before and after the trial.[5]

---

[3]The prosecutor admitted at the writ hearing that a case where the State does not need to use jailhouse informants is a stronger case than one where they are used. (RRI:26)

[4]At the time of the trial in this case, Rick Jackson was an Assistant District Attorney in Dallas County. He worked at the Dallas County District Attorney's Office from 1990 to 2006. He worked as an Assistant District Attorney in Denton County from September 2007 through February 2013. Jackson is no longer a practicing attorney and has an inactive law license. When questioned at the writ hearing as to why he left the Denton County District Attorney Office, Jackson stated that it was a, "mutual disagreement with my boss." (RRI:11). He described the disagreement with his boss as follows:
> "It had nothing to do with anything except his desire for me to be weak on crime and my desire to prosecute cases fully." (RRI:12).

[5]Even Rick Jackson admitted that jailhouse snitches are among the least credible witnesses. (RRII:25).

The prosecutor went to great lengths in collusion with these criminal informants, to lead the jury to believe that they were not testifying in order to receive some benefit. However, upon a review of the prosecutor's files, letters from two of these witnesses were discovered that clearly set out what they demanded, expected and had been told they would receive from the State for their assistance in this prosecution.[6] It is the letters from Lonel Hardeman and Zane Smith that blew open the secret deals and false testimony underlying this prosecution.

Defense attorney Jim Oatman represented Dennis Lee Allen on a capital murder case. Oatman passed away shortly after this trial. During trial, the State presented testimony from Lonel Hardeman. He testified that he had spoken to Allen and Allen had admitted being involved in this murder. At the time of trial, Hardeman was in jail with pending cases. At trial, Hardeman testified that he had no expectation or hope of leniency from the State in exchange for the information he had provided against Allen. The testimony from Hardeman at Allen's trial included the following:

> (Mr. Jackson - Prosecutor)
> Q:    Mr. Hardeman, do you have any expectations — what are your expectations for testifying in this case?
> A:    Nothing, just to bring a closure to Mr. Borns' death. That's it.
> Q.    Okay. Have I told you that we would talk about maybe doing something in your case after this was over?
> A.    No, sir.

---

[6]The prosecutor's files were reviewed by Innocence Project attorneys under an agreement by the Dallas County District Attorney's Office, instituted in recent years, that allowed the review of old trial files. Prior to the institution of this policy, these files and the information contained in them were secret and off limits to criminal defendants or their attorneys.

(Allen T.T. Vol. 3, p. 266.)

. . .

(Mr. Oatman - defense attorney)

Q:     So [Lisa][7] kind of passed the word to Berry[8] that you wanted to talk to him?

A:     Well, she stated to him that she knew about the case and for all charges [to] be dropped against me, that she would testify against Dennis Lee Allen. And when Rick Berry came to me, I only told him what I knew. I didn't know nothing else was going on.

Q:     Okay. So she kind of negotiated in your behalf, kind of like an agent I guess; is that right?

A:     Yes, sir.

Q:     Okay. If all charges were dropped you would testify against Dennis Allen?

A:     Correct.

Q:     Okay. But you really didn't want any part of that, did you?

A:     And I still didn't [sic].

(Id. at 272) (emphasis supplied).

. . .

(Mr. Oatman - defense lawyer)

Q:     You and Mr. Berry didn't talk about what might be in it for you; is that right?

A:     No, sir.

(Id. at 272.)

. . .

(Mr. Oatman - defense lawyer)

Q:     And you really don't want any help from Mr. Jackson here for doing the right thing by coming down here; is that right?

A:     That's right.

Q:     And I take it [if] once this case is over, Mr. Jackson came down and told your judge, hey, he helped us out on a capital murder case, you're going to go no, Mr. Jackson, I don't want your help. I want to face these two life sentences on my own because I am

---

[7]Lisa was Hardeman's girlfriend.

[8]Berry was the police investigator.

such a 1good soul; is that right?

A: Due to the fact that I never done a robbery before. I'm not going to ask Mr. Jackson for no help.

Q: Okay.

A: Because truthfully I can stand on the stand just like I am today and beat those robbery cases, because I never done a robbery before.

Q: Going to beat them, aren't you?

A: I put it in the Lord's hands.

(*Id.* at 274-75.)

After the Allen trial, upon review by Innocence Project attorneys, letters from Hardeman to the prosecutor were found in the prosecutor's file. These letters were in the prosecutor's file at the time of the Allen trial. These letters included the following statements:

> I Lonel Hardeman Jr. is writing you because I truly feel that I'm being used by the Department against crime. After turning over true statements, letters, and affidavits to your departments to Detective Rick Berry about the April 7, death of minister Jesse Borns; Willing to testifie [sic] against Dennis Lee Allen, a man that I only been with since Sept. 18, 1998 till today of Aug. & Sept. … **From day one Mr. Rick Berry was told from me and others for the information and the things he collected from me all charges against me to be dropped** since all allegations are not true. On August. 27, 1999.
> Mr. Rick Berry stated that he would help me like I helped him; Ms. Crum this would be the second murder case I've helped the Department on with true facts and statements, and willing to continue. **I feel as though with the cooperation that I give and the jepordy [sic] of my life that you should release me back to my family.** Mr. Ken Penrod and Alvin Pereze are the other two men that knows that I am honest as well as lain you should[.] I spoke with you before. Laying here in jail on charges I didn't commit is wrong, **Like I said I'll do whatever it takes to convict Dennis Lee Allen, Taking the stand won't be a problem, All I ask is for my life back with my family.** I help you once I'll help you again. Ms. Linda Crum from this letter I wish to hear from you as a response to

my letter and freedom; I thank you for in your time out to read this letter and pray to God that this incident come to an closing of the truth and righteousness of Justice. Say hello to 1 Ken and Mr. Pereze as well. Yours Truly, A man that wants his Freedom...Lionel Hardeman Jr....God knows who lieing[sic]....and who's telling the Truth...

(Letter from Hardeman to Capt. Crum, dated Aug. 29, 1999). (Writ Ex. 12)

Dear Sir: With all respect and honor to you I Lonel has been thinking of the issue of the Dennis Lee Allen case. **I'm wanting to let you know that I know that we can come to an agreement on the cases pending against me for the testimony against Dennis Allen.** I know that 1 if I don't agree to testifie that I would be facing trial in my behalf. I rather do time if I have to and not be number as a snitch than to do time on "Death Row" wondering who's waiting to kill me for talking against Dennis L. Allen and yet I still do time. I can't live that way. **In 1998 I help the homicide unit solve a murder [illegible] and I had 4 charges against me then and if the 1 District Attorney agreed upon a deal with me then I know you can [illegible] no different from any other District Attorney!** Mr. Ken Penrod and Alvin Perez is the two that helped me then I know somewhere **you and I can come to an agreement** for my testimony for the Dennise [sic] Allen trial. **All I'm asking for in the return of my self is for the 3 robbery cases be droped which I know for a fact I didn't do, and state jail probation 2 years for what I did do and sign befor I step on the stand so when I step down I'll be back in the arms of my family and not having to worrie if I'll ever see Dennise [*sic*] L. Allen for a while.** This is not a lot to ask for, I still will be accepting a conviction and I know I would have to walk very lightly for the rest of my life. **Other than this don't call me back, I don't want to waste your time nor mine.**

1I have a family to that loves me; I have childrens as well that care for me; Dennise [*sic*] is a man that I know would come after 1 me if he had a chance; Im risking myself, family and friend by standing trail against him; Im bring Justice to a family that lost a love one behind a person with no moral; **I think for what I'm asking for is not even enough but is acceptable to ask for,** I've been here once remember that in 1998 murder case I know it can be done, I'm willing to tell the truth **if your willing to give my life back to me.** I thank you for your time and patients and tell Douglas Shopmeyer God is watching his children every

step of the way. God know Imdtw-7 telling the truth and soon the court will to someway some how. . . .You can't Hide the Truth! You have the Right man now lets put him away! God Bless you.

(Letter from Hardeman to ADA Jackson dated Feb. 14, 2000). (Writ Ex. 13).

Dear sir: **My agreement with you is soon to be over**...with you or without you I know I can win my case along with out jepeordising [sic] my life as well as my family lives because I never done any robbery what so ever and Im willing to go to trial now **because I can't keep waiting on another man trial that keeps on being reschedule**. My state jail time is about up and yes Im on parole; Im not afraid of what I have to face, cause I am innocent.

When found innocent I'm facing maybe a little more time if any at least I know something is being done, so I can go home. Im tired of 1 of laying here knowing I can win my case than to wait on a man that is guilty. I have a life and a good family and childrens that loves me. **We can't keep waiting on another man when I can take care of my own.** Long as I been here I could have been to trial and home and if I have to be here past my state jail time than I rather go to trial cause Im not going to keep on waiting any longer on another man that keeps being set off. I hope you understand. **Im not going back on my word but Im not going to keep waiting on him either** if I have to come to court from the free world then I will but this waiting and waiting no more People can't even let me know what's going on I have to hear about it from T.V. You people tell me one thing and there's another I don't know what to think or do no more, I need my lawyer to contact me "ASAP" I have a lot of question that need to be brought out to you and him. Please contact me; thank you.

(Letter from Hardeman to ADA Jackson dated July 7, 2000). (Writ Ex. 18).

The District Attorney's file also contained letters that Hardeman's girlfriend wrote him while he was in jail. The following are excerpts from these letters:

What are they talking about doing on your cases? Are they offering probation at all?

Oh!!! This is what I wanted to talk to you about. One night right after you had left I was sitting on the steps alone drinking and shit and these

> 2 white men passed by. I felt like they were cops but I didn't give a shit right. 5 minutes later they stopped in front of me and started questioning me and shit about what I was doing and so forth. Anyway after we talked a minute he said you seem educated and all this. **Then he said that they were homicide detectives working on the case of the minister that got robbed and killed. He gave me his card in front of everybody right. I look at it and tear it up. He ask me if I wanted to make some money, I said yeah. He said if I come up with anything to call him. Well I didn't tell him what I knew. He told me what he knew. He said he looking for a black man that hangs where I was sitting with receding Salt-n-pepper hair in his late 30's to early 40's that goes by the name Stan. I told him I'd ask** around but I didn't know much. **But I know who did it Lonel. I called Marvin and asked him to get in touch with the detective to see if I could talk to him in exchange for lesser sentences for both of us.** But I do know 100% who did it. Do you think I'm doing the right thing? About talking to the detective? He hasn't come to see me yet so maybe Marvin didn't even call him but I sure would like to get in touch with him. Maybe you can find someone on your end to get in touch with him. **His name is Detective Rick Berry--DPD homicide division. If you contact someone who can get him, tell him that I need to speak with him regarding information on the homicide case on the minister. Maybe he can do something for us because I do have some pertinent information for him.** And I don't care about telling it because I don't plan on being in the South Side like that ever again. I'm looking out for me and my baby, fuck the rest.

(Undated letter from Lisa Davis (Hardeman's girlfriend) to Lonel Hardeman, at pp. 7-9) (emphasis supplied; typographical errors in original).

> Anyway I am sure you have heard about D.A. He has been charged with the death of the preacher I have been telling you about. He was p/u [picked up] 2 Saturdays ago. **That's why the detective didn't come see me** because they had him already. Plus he has 2 robbery charges pending. One of them is aggravated. It's in this past Saturday's paper. I will try and send that to you.

> So you know what that means huh? You probably can prove that he was the mastermind of that hustle. I sure hate that for him but you now have a better chance on your cases boo.

(Undated letter from Lisa Davis to Lonel Hardeman). (Writ Ex. 19).

Additionally, at Allen's trial, the State called a jailhouse informant, Zane Smith, who testified that Stanley Mozee, Allen's co-defendant, admitted to being involved in the crime. During Smith's testimony at Allen's trial, it was revealed that he had written a letter to the state in which he claimed that Mozee confessed to the murder. However, the state did not reveal that Smith had written a second letter to the District Attorney immediately after the Mozee trial, but before the Allen trial, that stated the following:

> Dear Prosecutor, I am writing this letter in response to the issues we discussed on the Mozee trial. Sir I was also scheduled to go to my parole hearing the day I was supposed to testify, that's why I didn't get to speak to you before I came in to testify. Mozee has been sending word by other inmates telling them I'm a snitch and also telling me that he's got my address and that he's gonna get me. Sir I am not too worried about those issues but what I'd like to know is -- Will you still be able to intercede on my behalf as you said. Sir I would appreciate any efforts that you can help me with in this matter. Please notify me if possible. Sincerely, Zane A. Smith. P.S. I've forgotten your name.

(Letter from Smith dated Aug. 2, 2000). (Writ Ex. 41).

This letter contradicts Smith's testimony at Allen's trial where he indicated that he had already been sentenced in his own case and did not reveal that he was expecting more benefits from the State than what had already been received.

At the evidentiary hearing on this writ application, former prosecutor Rick Jackson was asked about these letters, as well as about his general discovery practices in this case. Jackson was extensively questioned concerning his discussions with the

informant witnesses, as well as help given to them by him or Detective Berry, the police investigator on the case. As set out below, Jackson's testimony established the following:

1.     He had the letters from Hardeman and Smith in his possession at the time of Allen's trial.

> "Q.    So you have these letters for a long period of time prior to the beginning of either one of these trials; is that right?
> A.     I believe the dates reflect that, yeah." (RRII:19)[7]

> "Q.    And you had those in your file on this case?
> A.     Yes.
> Q.    And you received and read and was -- and you were familiar with those letters, --
> A.     I would think so.
> Q.    -- right?
>        Prior to either one of these trials?
> A.     I would think so, yeah." (RRI:90-91)

> "Q.    So you were aware at the time of the trials of these men, that he had written this letter?
> A.     Yes." (RRI:93).

2.     He recognized then, as well as now, that these letters constitute exculpatory evidence that he was obligated to turn over to the defense.

> "Q.    Okay.  So you would agree, though, this is certainly Brady materials?
> A.     Yes." (RRI:94)

> "Q.    ... so is the fact that you have led -- or the fact that a defendant -- a prosecutor witness, a snitch, has some expectation of help from you, do you consider that to be exculpatory?

---

[7]The testimony referenced is from the writ hearing held on October 26-27, 2015.

A.     Sure." (RRI:57).

"A.     I did some things later on, yes." (RRI:101)

3.     In addition to his standing *Brady* obligation, he also was under a court order to turn over exculpatory evidence. (Writ Ex. 7).

4.     He admits that Lonel Hardeman gave false testimony in Allen's trial.

5.     He admits that he did nothing to correct the false testimony or inform the court of its falsity, even though he knew he had a duty to do so.

> "Q.     Here it says, "Okay" -- this is a question from you -- "Have I told you that we would talk about maybe doing something in your case after this was over?"
> And he said, "No, sir." But, in fact, that is exactly what you had told him, isn't it?
> A.     Yes.
> Q.     You had told him you would do something, --
> A.     No.
> Q.     -- talk about something on his case, doing something on his case after this was over?
> A.     Potentially, yes.
> Q.     And he said, no, sir, you haven't, right?
> A.     For the second time, yes.
> Q.     So he's lying, isn't he?
> A.     At that point, I don't know if he's lying for sure or not.
> Q.     What do you mean you don't know if he's lying for sure? You just told us that you had talked to him about doing something on his case
> --
> A.     Oh, that -- yes. I'm sorry. Yes.
> Q.     -- and he says, no, sir, you haven't.
> A.     That's correct.
> Q.     So he's lying?
> A.     At that time, I would think so, yeah.
> Q.     Okay. So when you heard him tell that lie, what did you -- well, let me back up. When you, as the prosecutor, heard this witness tell this lie, what was your legal and ethical obligation?

A.    To correct it.

Q.    Did you correct it?

A.    It's in the transcript. I don't recall what happened. What's in there is what happened.

Q.    Okay. Did -- so if you did not correct it, in this transcript, then did you fail in your legal and ethical obligations?

A.    Yes.

Q.    Okay. And so -- and I understand you haven't memorized the transcript, you don't know whether it's in here or not.

A.    I do not.

Q.    Okay. So if you didn't correct it, then you would agree that there has been a Giglio -- at the very least a Giglio violation, right? Because that requires you to correct that.

A.    Okay.

Q.    You agree?

A.    Sure." (RRI:75-77)


"Q.    If, in fact, he is saying -- let's say my interpretation is correct, and he is, in fact, saying I never wanted a deal, if that's what he's saying, that's a lie, isn't it?

A.    You're asking me to speculate and assume things that are not there.

Q.    Let me tell you what I'm asking you, I'm asking you, as the prosecutor who was prosecuting the case and putting on this witness, exercising your -- doing your duty under Brady and Giglio and your ethical duty not to allow false evidence to go uncorrected, based upon those things, that is false evidence, isn't it?

A.    Potentially.

Q.    And what did you do about that?

A.    I don't know. Whatever is in the transcript is what I did about it.

Q.    And if the transcript reflects you did nothing about it, what would you say about that?

A.    I don't know that that's what the transcript reflects.

Q.    Okay. Let's just assume, hypothetically, if the transcript reflects that you did not do anything to correct that false evidence, what would you say about that?

A.    You're asking -- basically you're asking me -- you're putting me in a position to where you're just wanting me to say I did something wrong, that's the assumption. You're asking me to assume I was wrong and then say I was wrong.

Q.      Well, I'm asking you to -- I'm asking you hypothetically.
A.      Which is an assumption.
Q.      Right.
A.      You're asking me --
Q.      I'm asking you a hypothetical question.
A.      You're asking me to assume I was wrong and then say I was wrong.
Q.      Okay. Let me rephrase it.
A.      Okay.
Q.      Hypothetically -- hypothetically if -- okay. You just told me that you agree that this testimony would be untruthful.
A.      Potentially.
Q.      So hypothetically, if we scour the transcript and we find in the transcript that you did nothing to correct this, would you agree that you have violated your duty as a prosecutor?
A.      There is no reason to speculate or be hypothetical because it's there. It's either there or it's not.
Q.      If it's not, then you violated your duty?
A.      Then it's not there.
Q.      Then you violated your duty?
A.      Potentially." (RRI:80-82).

"Q.      All right. Let me go over with you some more of -- I mean, Hardeman -- it's kind of -- this is kind of a tough situation, because Hardeman came in and lied, didn't he, in court? I mean, there is no question Hardeman lied in court, didn't he?
A.      On what issue?
Q.      About whether he had any kind of expectation of help.
A.      Not particularly, no.
Q.      Did he sort of a little bit lie?
A.      He may have put somewhat of a misimpression up, sure.
Q.      Okay. So do you think, as a prosecutor, you have a duty to correct a misimpression as much as you have a duty to correct a lie?
A.      Yes.
Q.      Do you see it, you have that same duty?
A.      Yeah. And the transcript will reflect whether I did or didn't. (RRI:87).

6.    Jackson also admitted that he does <u>not</u> have any memory of disclosing the

Hardeman and Smith letters to defense counsel Oatman.

"Q.    But you do say you showed this letter to Mr. Oatman, and that
would have been at the same time you showed all the other letters, the
morning that they were beginning -- that you-all were beginning the voir
dire on the Allen case?
A.    I believe so, yes.
Q.    That's when you would have shown him this?
A.    Correct.
Q.    You would have also shown him the first letter from Zane Smith
at the same time?
A.    I believe so, yes.
Q.    You say, "I believe so," you don't really know for sure, do you?
A.    Well, like I said, I don't have any independent recollection of
showing him any particular piece of evidence, no." (RRII:69-70).

"Q.    But there is no question, just like we talked about yesterday on the
Hardeman letters, this is clear Brady/Giglio material that needed to be
turned over to Jim Oatman at the time --
A.    Yes.
Q.    -- of the trial or prior to the trial?
A.    Yes.
Q.    Okay. And you have no independent recollection of whether you
showed it to him or gave it to him, but we go back to your entry on your
notes about showing him physical evidence and that's where this is?
A.    Yes.
Q.    Okay. That's it, that's all you have go to on?
A.    Yeah. It was 15 years ago. I don't remember everything I did on
every case I tried, no." (RRII:76-77).

"Q:    Okay. So your testimony is, is that the reason -- well, let me back
up. You don't remember specifically giving these letters to Oatman, do
you?
A.    Not specifically, individually, no.
Q.    Okay. But the only reason why you're saying that you did give
them to him is because of your belief that when you said, show Oatman
the knife and the rest of the physical evidence, that included letters from
Hardeman that we've been talking about?" (RRI:107).

"Q.	Well, so -- but what you're saying is, you remember showing them to him?

A.	I don't -- no. I didn't say I specifically remember --

Q.	You don't even remember showing them to him?

A.	Specifically?

Q.	Yeah.

A.	No." (RRI:111).

"Q.	Okay. So you don't really remember showing them to him, but if we're going to find -- or if the Court is going to find that you did, they are -- the Court is going to have to find that the words "other physical evidence" includes these letters. I mean, that's really what it boils down to.

A.	I believe that -- yeah. I believe I have documentation that shows that I did that, yes.

Q.	And it's that. There is nothing else. You keep saying, I have documentation. That's it, right?

A.	Is that no documentation?

Q.	Well, I mean, I'm just saying, you don't have some other documentation?

A.	Is that not documentation?

Q.	Well, the question is, is that documentation -- when you say, "I have documentation," is that all the documentation you're referring to?

A.	Yes." (RRI:113).

7.	He also admits that he never showed Oatman the letters at any time during the months prior to trial, even though he knew they constituted exculpatory evidence.

"Q.	-- and you know the dates the letters were written. But you're saying that you know for a fact you did not show these letters to Jim Oatman -- or -- well, let me just -- you talked with Oatman, you know for a fact that you didn't show any of these Hardeman letters that we have been talking about to Jim Oatman prior to the day -- the beginning -- the day the Smith -- I mean, the Allen trial began?

A.	I believe that's true, yes.

Q.	Okay. Even though you were under a court order to provide this exact type of evidence months before then?

A.	Well, the orders were signed, yes, before then." (RRII:19)

"Q. But at the very least, if we can -- if we believe that your notation here about the rest of the physical evidence encompasses these letters, at the very least, you held them back for months before you gave them to Oatman, at the very -- to be putting it in the best light possible, if you turned them over, you certainly didn't turn them over until the day the trial began?

A. Correct." (RRII:20).

8. He apparently kept extensive notes of everything he did on this case, including detailed notes of evidence he gave Oatman and there is no reference in his notes to disclosing these letters to Oatman. (Writ Exs. 14, 15, 16, 17, 50, 51). Had he disclosed these letters to Oatman, he certainly would have made a note in his file to that effect.

9. On the morning the voir dire began, his notes reflect that he showed Oatman the "knife & the rest of physical evidence." (Writ Ex. 15). Although he has no memory of showing Oatman these letters at that time, since he has no notes that show he provided them to Oatman at any other time, he claims to believe that he must have shown them to Oatman when he showed him the knife and physical evidence right before the voir dire began. (RRI:107, 111, 113; RRII:20, 107)

10. Jackson says he does not believe he had any deal, agreement or understanding with any of the criminal informants that would constitute Brady or Giglio material.

11. He does admit that he communicated to the informants, either through their attorneys or directly, that if they testified at Allen's and Mozee's trials they would

talk afterwards about him doing something to help them on their case. However, he did not consider that Brady or Giglio material.

> "Q. . . . So what do you think the lawyer then hears, the defense lawyer -- what's the defense -- what do you intend for the defense lawyer to understand from that conversation?
> A. What do I intend?
> Q. Right.
> A. I intend to communicate to them that if their client decides that he wants to testify and that he testifies truthfully and it's not about whether he gets a conviction or not or whether the case results in a conviction, if the -- if what we understand the testimony to be, if that is what he testified -- he or she testifies to, that if it is consistent with that, then at the end, if there is something that I could possibly do, then maybe it could get done. It's never a guaranty, it's never a promise to -- something will for sure happen, because there have been cases where a witness testified and there wasn't anything I could do for them and they did get -- they honestly didn't get the benefit of their cooperation. There was nothing that I could change. So what it comes down to is if they -- you know, if they want to have something, or the potential to have something happen, that's what cooperation is for.
> Q. So cooperation is designed in order to give them the potential to have something happen on their own case?
> A. I would think that would be a reasonable assumption for that lawyer to have for their client, yes." (RRI:34-35).

> "Q. . . . So they understand that it's up to you after they testify as to whether or not they're going to get anything from you?
> A. I would think that would be the case, sure." (RRI:35).

> "Q. So at some point in the future, whether it's the day after the trial or a month after the trial, at some point in the future, then you deal with that witness' issues, right?
> A. Right. ..." (RRI:36).

> "... You said that basically what you do with snitches is you tell them -- or you tell the lawyers you'll talk about their situation later. You just want them to come testify and tell the truth.
> A. Right." (RRI:142)

"Q. You think the jury understands that these people are testifying in order to get something out of the case, out of their case?

A. In some cases, that's probably true, and in other cases, it's not.

Q. So when you have a snitch come in to testify and they are actually testifying because they want something from the DA's Office, but it is presented to the jury that they're testifying because they are a good citizen and they just want to help fight crime, don't you agree that's misleading to the jury?

A. If that were the case." (RRII:7).

. . .

"Q: Of course, you've talked to Schopmeyer[8] about how this is going to help Hardeman to testify, right?

A. No.

Q. You didn't -- you didn't even have a conversation with Schopmeyer about --

A. What's going to happen?

Q. -- if he tells the truth, then we'll see what we can do to help him out?

A. Okay. Well, when you phrase it like that, yes." (RRI:86).

12. Jackson admitted that he had an agreement with the informants, including Hardeman, to consider leniency. That is, he had promised his informants that if they testified against Allen or Mozee and Jackson was satisfied with their testimony, Jackson would consider speaking to the prosecutor handling the informant's case about whether the informant should be given some benefit or break in exchange for his cooperation.

"Q. It was an understanding that you would consider leniency later, but that you hadn't agreed to the leniency yet?

A. I had not agreed to anything yet, that's correct.

Q. But you had agreed to consider it?

A. Sure." (RRI:48).

---

[8]Doug Schopmeyer was Hardeman's lawyer.

"... And then after his testimony, I think we talked yesterday, that you did do what you have indicated to him you would so, which is go talk to his prosecutor about working out or giving him some credit for his help.

A.      Well, I never said I would, in fact, do it.  I said it was a possibility.

Q.      Okay.  And that possibility came true for Lonel Hardeman?

A.      I believe so.  I don't recall specifically, but I believe so.

Q.      Because, in fact, those 25 to life cases, those robbery cases, he wound up pleading to three years on those, didn't he?

A.      If that's what the record reflects, then that's what happened."

(RRII:11).

13.     Jackson repeatedly maintained, however, that he would *never* have assisted, nor directed anyone to assist, a witness with a pending criminal matter before the informant testified. (RRI:31-32).  His testimony was, "Because we don't ever, ever--or I never did--give a deal to someone up front, just never happened, period, end of story." (RRI:31). He testified that he drew the line at promising to "potentially' help an informant but only after that person testified, and never before. He said that this applied not just to him, but to everyone working at his direction, including the police.

"Q.     (BY MR. UDASHEN)  Let me show you what we already put in as Defendant's Exhibit Number 17.

A.      Okay.

Q.      And can you read that entry right there where it says, 'Berry.'

A.      'Helped out Manning and DeGraftenreed with their probation violations.'" (RRI:127).

"Q.     Okay.  Would you agree with me that if the police detective is helping out a State's witness with a probation violation, that's Brady and Giglio material that has to be revealed to the defense lawyers?

A.      If it was about pending violations, yes." (RRI:130).

"Q.     (BY MR. UDASHEN)  Okay.  So assuming that DeGraftenreed was a State's witness, which he was?

A.   Okay.

Q.   And he was on probation and had a motion to revoke his probation filed, which he did?

A.   Okay.

Q.   And he asked Detective Berry to help him and Detective Berry went and helped him, which your own notes says he did, right?

A.   I'm assuming that, yeah.

Q.   Wouldn't that be something that would be Brady that you should tell the defense lawyers about?

A.   If it was helped on that violation, yes." (RRI:133).

"Q.   But if, in fact, -- just to be clear, just like the other, DeGraftenreed -- that if, in fact, Detective Berry went and helped this witness, Charles Manning, with his probation revocation problems prior to his testimony and if you did not reveal that to the defense lawyer, that's a Brady violation?

A.   If all those things were true, yes.

Q.   Because whatever Detective Berry does is attributable to the prosecution?

A.   Yes." (RRI:140).

14.   However, Jackson's own pretrial notes reflect that Detective Berry helped at least two of the informant witnesses (Manning and Degraftenreed) with their own probation violations and revocation motions prior to Allen's trial, and that Jackson was personally aware that the informants had been given such assistance. (Writ Ex. 17). He also admitted that any such assistance would be *Brady* material subject to mandatory, timely disclosure to the defense. However, there was no disclosure to the defense of the help to these witnesses and this help was not revealed during questioning of these witnesses in trial. (See Jackson's notes; Writ Exs. 14, 15, 16, 17, 50, 51).

"Q.   (BY MR. UDASHEN) Let me show you what we already put

in as Defendant's Exhibit Number 17.

A. Okay.

Q. And can you read that entry right there where it says, 'Berry.'

A. [reading from notes] 'Helped out Manning and DeGraftenreed with their probation violations.'" (RRI:127).

"Q. Okay. Would you agree with me that if the police detective is helping out a State's witness with a probation violation, that's Brady and Giglio material that has to be revealed to the defense lawyers?

A. If it was about pending violations, yes." (RRI:130).

"Q. (BY MR. UDASHEN) Okay. So assuming that DeGraftenreed was a State's witness, which he was?

A. Okay.

Q. And he was on probation and had a motion to revoke his probation filed, which he did?

A. Okay.

Q. And he asked Detective Berry to help him and Detective Berry went and helped him, which your own notes says he did, right?

A. I'm assuming that, yeah.

Q. Wouldn't that be something that would be Brady that you should tell the defense lawyers about?

A. If it was helped on that violation, yes." (RRI:133).

"Q. But if, in fact, -- just to be clear, just like the other, DeGraftenreed -- that if, in fact, Detective Berry went and helped this witness, Charles Manning, with his probation revocation problems prior to his testimony and if you did not reveal that to the defense lawyer, that's a Brady violation?

A. If all those things were true, yes.

Q. Because whatever Detective Berry does is attributable to the prosecution?

A. Yes." (RRI:140).

Degraftenreed testified that he had lived out his probation without revealing that he only did so because of Detective Berry's intervention. (RRIII:186). Manning

testified that he had cleaned up his life and did not reveal that it was Detective Berry's help that kept him out of the penitentiary. (RRIII:215-217).

15. Jackson's co-counsel made a final argument to the jury stating that Charles Manning had no reason to lie. This may be because Jackson had not even told his co-counsel that Berry had helped Manning with his probation. The argument was as follows:

> "'Remember Charles Manning? Remember the gentleman, the homeless gentleman who talked about getting his life back together? Remember how he told you what he remembers from the streets, the people he knew, the people who ran in the neighborhood?' . . . 'Why would Charles Manning lie about that? . . . Why would Charles Manning lie? He is probably the most credible witness of any witness in this case. Because he is the one witness that no matter what Mr. Oatman may try to paint on those other witnesses about deals that they may have had or he alleges or thinks occurred or suggests occurred, there is no deal with Charles Manning. There is no reason for Charles Manning to lie." (RRI:138).

16. After Allen's trial, Jackson took steps to help several of these criminal informants obtain good deals on their own cases.

> "Q. But it would certainly not surprise you to learn that you did some things for Hardeman?
> A. No." (RRI:89).
>
> "Q. So you did -- you did do some things for Hardeman?
> A. After the trial, yeah.
> Q. After the trial. No question about that?
> Q. I don't recall what they were, but, yeah." (RRI:126).
>
> "A. I did some things later on, yes." (RRI:101)

Also, Jackson went so far in rewarding the jailhouse informants for their testimony that with Zane Smith he convinced the judge presiding over his case to do something that the law did not allow. By the time Allen's trial was over, the 30 day time period for a motion for new trial had already passed in Smith's case. Yet, Jackson joined Smith's defense attorney in presenting a late motion for new trial to the court and convincing the judge to grant it. He then cut substantial time from Smith's sentence and arranged for him to get out of jail. In other words, Jackson convinced a district judge to enter what was effectively an illegal order that had the effect of securing the maximum possible benefit for informant Smith – a sentence reduction to 244 days, which worked out to time already served, and led to Smith's immediate release from the county jail as a result of his testimony against Allen and Mozee. (Writ Exs. 36, 37, 39, 40, 41, 42, 43, 44).

17.    When the informants in this trial refused to admit they were testifying with the hope of leniency the jury was clearly misled. Even Jackson admitted this:

> "Q.    So when you have a snitch come in to testify and they are actually testifying because they want something from the DA's office, but it is presented to the jury that they're testifying because they are a good citizen, and they just want to help fight crime, don't you agree that's misleading to the jury?
> A.    If that were the case." (RRII:7).

# III.

## Judge Stoltz's Findings

On October 28, 2014, Judge Stoltz entered findings of fact and conclusions of law. Judge Stoltz's findings were "based on its review of the pretrial and trial proceedings against both Applicants, and the Application for a Writ of Habeas Corpus, including the memorandum and exhibits, the State's response to the Application for Writ of Habeas Corpus, and the agreement of counsel." (FOF, p. 4). Judge Stoltz made the following specific factual and legal findings:

1.     The State failed to disclose numerous letters from informants Hardeman and Smith contained in the trial prosecutor's file where these informants demanded benefits from the State in exchange for their testimony. (p. 11).

2.     It is clear from the trial record that these letters were not disclosed. This is clear from the informant's testimony and denial of receiving or expecting benefits from the State. (p. 11).

3.     That the trial prosecutor elicited sworn testimony from Hardeman that he knew to be false and that the trial prosecutor failed to correct the false testimony when it appeared. (p. 6).

Judge Stoltz's findings and conclusions were joined in and agreed to by the Dallas County District Attorney's Office.[9]

---

[9]Judge Stoltz did not hear testimony from Jackson. His findings were based on the record evidence. As explained below, there is nothing about Jackson's testimony that refutes the fact

# IV.

## Judge Hawthorne's Findings

Following the two day evidentiary hearing and six hours of testimony from prosecutor Rick Jackson, Judge Hawthorne issued "Findings of Fact on Remand." In a largely conclusory fashion, with no real analysis, Judge Hawthorne found the following:

1. "The court finds Mr. Jackson's testimony to be credible."

2. "Mr. Jackson had no specific recall of handing the jailhouse letters from the informants to defense counsel."

3. Mr. Jackson's "meticulous trial notes indicate that he turned over all of the physical evidence to defense counsel."

4. "Mr. Jackson was convinced that he would have included the jailhouse letters as part of the physical evidence handled over to defense counsel."

5. "Mr. Jackson's testimony and his notes support that he turned over the jailhouse letters to defense counsel."

Judge Hawthorne's findings did not address the wealth of evidence showing that defense counsel did not have the jailhouse informants' letters. Nor did Judge Hawthorne address the substantial evidence that shows Jackson did not reveal them, and knew at the time of trial that he had not revealed them. Additionally, Judge

---

that the record evidence shows that Jackson withheld exculpatory evidence.

Hawthorne's findings ignored the indisputable fact that Jackson presented false testimony from Lonel Hardeman. In fact, Jackson admitted in the writ hearing he knew Hardeman's testimony was false, but he did not correct it or notify the trial court or jury of its falsity.

## V.

## Legal Questions Before Court

Two different judge have issued fact findings concerning whether Rick Jackson withheld exculpatory jailhouse letters from defense counsel. Judge Stoltz, based on a thorough review of the trial record and the evidence presented with the writ application, concluded that Jackson had withheld the jailhouse informant's letters from defense counsel. Judge Hawthorne, without considering the trial record, or any of the other evidence presented with the writ applications or at the hearing, and based strictly on Jackson's testimony, concluded that Jackson had turned the letters over to defense counsel.

Judge Hawthorne did not question or disturb Judge Stoltz's earlier finding that the letters were *Brady/Giglio* material, and that any failure by Jackson to turn them over would require relief for Allen. Indeed, Jackson himself admitted that the letters were exculpatory evidence and that he was required to make them available to the defense prior to trial, as well as to correct any testimony by the informants that he had reason to know was false.

Thus, the Court of Criminal Appeals is presented the following questions:

1.    Allen's defense lawyer, Jim Oatman, is deceased. Prosecutor Jackson's testimony was that he had no memory of turning over or showing the letters to Oatman, but is guessing that he did because of a notation in his file reflecting that he showed him "physical evidence" on the first day of trial. In light of the lack of direct evidence of whether the letters were revealed to defense counsel, is it appropriate to consider all of the other evidence, and the facts and circumstances of the case, in order to make a determination as to whether the letters were turned over? In other words, is it appropriate to consider the circumstantial evidence in determining whether the letters were turned over?

2.    Prosecutor Jackson testified that he has no memory of revealing the letters to defense counsel. He said he "believes" he would have done so when he showed defense counsel the "knife & rest of physical evidence" the morning the jury selection began for the trial. Is it appropriate, as Judge Hawthorne did, to take this statement, consider it in a vacuum, without reviewing or analyzing the rest of the evidence, and conclude that this proved that Jackson turned over the letters?

3.    Or, rather than the approach taken by Judge Hawthorne, is the more appropriate analytical method to consider Jackson's testimony as one piece of evidence to be analyzed and considered in conjunction with all of the evidence in order to determine if this exculpatory evidence was revealed to the defense counsel?

4.    The evidence clearly shows that defense counsel Oatman did not have these jailhouse letters. Should the court consider that in its analysis?

## VI.

## The Role of the Court of Criminal Appeals in Deciding The Writ Issue

In *Ex parte Navarijo*, 433 S.W.3d 558 (Tex. Crim. App. 2014), the court explained the role of the trial court and the Court of Criminal Appeals on a writ application as follows:

> On post-conviction review of an application for a writ of habeas corpus, the convicting court is the original fact-finder, and this Court is the ultimate fact-finder. *See Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014) (citing *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012)). This Court ordinarily defers to the habeas court's fact findings, particularly those related to credibility and demeanor, when those findings are supported by the record. *Id.* We similarly afford deference to the habeas court's rulings on mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). On the other hand, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Ex parte Flores*, 387 S.W.3d 626, 634-35 (Tex. Crim. App. 2012). We review de novo mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *See Weinstein*, 421 S.W.3d at 664 (citing *Guzman*, 955 S.W.3d at 89).

In *Navarijo*, the trial court recommended that relief be granted on a recantation case after finding that the complainant's recantation was more credible than her trial testimony. Exercising its authority as the ultimate fact finder, the Court of Criminal Appeals rejected this finding. The court said that the trial court could not make a fact

finding based strictly on the consideration of the credibility of the complainant's testimony and was required to consider the complainant's testimony in light of the entire evidence presented at trial. Similarly, in *Ex parte Harleston*, 431 S.W.3d 67 (Tex. Crim. App. 2014), the court rejected a fact finding by a district court by noting that there was significant objective evidence that contradicted the trial court's fact finding.

In the case at bar the fact findings are not actually based on a credibility determination. Since Jackson himself did not say he remembers disclosing the letters to Oatman there is no credibility determination to be made. In other words Judge Hawthorne cannot say she believes him when he says he showed Oatman the letters since his testimony is that he does not remember showing him the letters. Judge Hawthorne may be finding he is credible when he says he does not remember showing Oatman the letters but that does not aid in determining whether he did. Under this situation Judge Hawthorne's fact findings are entitled to little or no deference from the Court of Criminal Appeals since they are not based on a traditional credibility determination. In addition, as discussed below, the court's conclusion that he revealed the letters is contradicted by and cannot be reconciled with the rest of the record, including additional pages of the same "meticulous notes" prepared by Jackson that were cited by Judge Hawthorne.

# VII.

## Jackson's Failure to Correct False Testimony

There is no question that Jackson failed to correct false testimony from Lonel Hardeman. In fact, the record shows he elicited some of the false testimony himself. Faced with the damning evidence of this, Jackson actually confessed to this transgression at the writ hearing.

At trial, Hardeman testified that he had no discussion with the District Attorney or police about help on these cases, did not want their help and would not accept their help if offered. He also said that he was only testifying to give closure to Rev. Borns' family and for no other reason. This was all false testimony, Jackson knew it was false and he failed to correct it or notify the court.

In *Napue v. Illinois*, 360 U.S. 264 (1959), the court held that when a State's witness falsely testifies that the witness had received no promise of consideration in return for his testimony, though in fact the prosecutor had told the witness he would consider leniency, the prosecutor had a duty to correct the testimony. *See also, Ex parte Adams*, 768 S.W.3d 281 (Tex. Crim. App. 1989) (prosecutor has duty to correct perjurious testimony by state witness).

In the case at bar, the record clearly establishes this constitutional violation. Even prosecutor Jackson agrees that Hardeman gave patently false testimony that Jackson was obligated to correct, but the record shows he did not. Moreover, Judge

Hawthorne, in her Findings of Fact on Remand, did not address this point, leaving Judge Stoltz's previous findings undisturbed.

This is a serious constitutional violation, not to mention a clear ethical breach by prosecutor Jackson. Based on the clarity of the record on this point, relief is warranted.

## VIII.

### Judge Hawthorne's Fact Findings Are Not Supported By The Record

A review of all of the evidence from the trial, as well as the writ hearing, clearly shows that Judge Hawthorne's fact findings are not supported by the record. In fact, a full review shows that her fact findings are directly contradicted and disproven by the record.

Stripping away the misdirection, double talk and obfuscation, Rick Jackson's testimony does not come close to showing that he revealed the jailhouse letters to defense counsel Oatman. In fact, Jackson's testimony amounts to nothing more than a statement that he has no memory of showing the letters to Oatman, but he "believes" he did. The only thing he points to in support of his "belief" that he must have turned the letters over to Oatman is a notation in his file where he wrote, "Show Oatman," and then wrote "Knife & Rest of Physical Evidence." It is this note that Judge Hawthorne also references in her findings on remand. However, this note does

not support a conclusion that Jackson revealed the letters and really is evidence of just the opposite.

First, Judge Hawthorne's findings fail to accurately and completely state what Jackson's note said. Judge Hawthorne's findings state, "his meticulous trial notes indicate that he turned over all of the physical evidence to defense counsel." This is an inaccurate rendition of Jackson's note and presents it completely out of its proper context. What Judge Hawthorne's finding leaves out is that Jackson's note indicates that he showed Oatman the "rest of the physical evidence" along with the knife. (Writ Ex. 15). This shows that what he meant by physical evidence were items, like the knife, which were collected by the police at the crime scene or obtained pursuant to a search warrant, and which he could not give a copy to Oatman. Ignoring the fact that the reference to showing Oatman the physical evidence was connected to the showing of the knife completely misrepresents the context of the note.

In addition to that, Judge Hawthorne's finding fails to realize that this note was one of two pages, which must be read together to understand the document's meaning. On the first page, Jackson wrote, 'Items turned over to Δ Atty Jim Oatman for Δ = Dennis Allen." (Writ Ex. 15). Following that, Jackson listed numerous items which he gave copies of to Oatman and/or showed him in court. These items were things like lab reports, SWIFS reports, the autopsy report, criminal records of witnesses and, most importantly, written statements from the State's witnesses. In

order to believe that these jailhouse letters were part of the physical evidence Jackson showed Oatman, it would be necessary to conclude that letters from the State's witnesses were more like a knife, a blood stain, or other items collected by the police than they were like written statements of witnesses. It would also be necessary to believe that Jackson made (as the court found) "meticulous notes" of all the documents he gave or showed to Oatman, but did *not* make any such entries for the jailhouse informants' letters - instead relying on a general "physical evidence" notation to cover the discovery he gave Oatman for the correspondence (but only the correspondence).

Such conclusions are illogical, contrary to common sense and not supported by the record. In fact, it is clear that physical evidence, as used by Jackson in his note, does not include letters written by the jailhouse informants.

In addition to the context of the note indicating that the term "physical evidence" referred to the evidence seized by the police, that is what this term always means in a criminal trial context. Physical evidence is items that the police retrieve from the crime scene or by search warrant that cannot be copied or given to the defense attorney. Attempting to apply any other meaning to this term is contrary to its common and usual usage.

The evidence from the writ hearing shows that Jackson apparently kept meticulous notes of everything he did on this case. He wrote a note when he spoke

to a witness or when he gave defense counsel items. He even made a list of problems he needed to address on the case which he titled "Exculpatory Evidence." (Writ Ex. 14). Even this list has no reference to these jailhouse letters, probably because he did not need to address it in trial because he knew Oatman did not know about the letters. If this list actually is, as Jackson claims, a list of exculpatory evidence that he needs to let the defense know about (RRI:103), that is even more damaging to his argument because these letters are not listed. (RRI:104). Jackson himself admitted, and the record shows, that there is absolutely no reference anywhere in his notes to showing the letters to Oatman and the only reason he is contending that they are included in the "physical evidence" shown to Oatman is that he cannot find any other note on which to rely. At the writ hearing, he testified that he looked through his file for something showing he gave these letters to Oatman, and this is all he came up with. Under questioning by the Conviction Integrity Unit prosecutor, he said:

> "Q. And speaking of Smith and Hardeman, were you specifically looking for any evidence or documentation within your file indicating that you had turned over the letters that we spent so much time talking about?
> A. Yes." (RRII:127).

It is additionally noteworthy that Jackson admits that he never gave Oatman copies of these letters. He admits this despite his acknowledgment that the letters constitute exculpatory evidence that he was obligated legally to turn over to the defense. Yet, his testimony is that if he showed them to Oatman, it was on the day

of the beginning of the trial, while the court was preparing to begin jury voir dire, while he was showing him the physical evidence. In other words, Jackson knew and admits he never gave Oatman copies and never even informed him of these letters prior to the day the trial began. The fact that Jackson admits that he violated his legal duty to turn over exculpatory evidence, or at least delayed compliance, shows that he was not even trying to be fully honest and forthcoming in relation to his legal duties. It also severely undermines any conclusion that he turned over these letters, since he admits that even if he did turn them over, he did not do so in a timely manner.

Moreover, the fact that Jackson undoubtedly withheld other exculpatory evidence belies any claim that he turned over these letters. For instance, Detective Berry intervened to help State's witnesses Charles Manning and Alvin Degraftenreed avoid having their probations revoked. Had Berry not done so these two witnesses would have been in prison, rather than in the free world, when they testified. Jackson was fully aware that Berry had done this as reflected in Jackson's personal notes, yet he never revealed this to defense counsel, presenting these witnesses as people with no questionable motive for their testimony.

When confronted with these facts at the writ hearing Jackson lamely contended that Berry's help to these witnesses may have occurred at a different time and on different cases than the ones they were on probation for during the months leading up to Allen's trial. After being shown that Berry, in fact, helped Manning and

Degraftenreed with their existing problems while they were helping the State on the Allen and Mozee cases Jackson reluctantly conceded the obvious: that this was *Brady* evidence that he had an obligation to reveal to the defense. However, he has no recollection of doing so; no documentary proof of any kind that he did so; and the jury heard the witnesses' false testimony and the false argument of Jackson's co-counsel without knowing about the benefits these witnesses had been given.

A full inquiry of whether Jackson revealed the jail house informant letters to Oatman must consider the fact that he admittedly suppressed other exculpatory evidence. The fact that the record before the court shows Jackson engaging in a pattern of suppression of exculpatory evidence is powerful evidence demonstrating his suppression of the jail house informant letters.

Most importantly, the writ record shows, without any question, that Oatman was not aware of these letters. The trial record shows that Oatman was not aware of these letters. And it is equally clear that Jackson knew Oatman was not aware of these letters. In fact, Jackson boldly elicited false testimony from at least one witness because he knew Oatman could not contradict the testimony with these letters.

Among the many items of evidence in this writ record that show that Oatman did not have any knowledge of these letters are the following:

1.  Jackson does not remember showing the letters to Oatman.

2.  Jackson does not even claim to have given Oatman copies of the letters.

3.     Jackson apparently kept meticulous notes of everything he did on this case, including items he gave to Oatman, and there is no reference in his notes to ever showing these letters to Oatman.

4.     Jackson recognized at the time that these letters were *Brady* material and he admits having possession of them.

5.     Jackson admits that he did not give these letters to Oatman or even show them to him, if he ever did, until the morning the trial began. Even under his own best version, he is delaying compliance with his *Brady* obligation and not fully complying with it.

6.     Oatman's voir dire included a discussion of the State making deals with informants for testimony, and he said that there would not be a written document showing the state made a deal. (RRII:170). This shows that Oatman had no idea that written evidence of deals and agreements with informants actually did exist.

7.     Oatman vigorously cross-examined Hardeman about any deal, discussion, understanding or desire for help from the State with his cases. Hardeman denied having these discussions or even wanting help with his cases. If Oatman knew about the Hardeman letters, he would have used them to show the jury that Hardeman was lying. Oatman was a very good lawyer. Even Jackson admits that. (RRI:52-53). Moreover, testimony was presented at the writ hearing from former prosecutor and District Judge John Creuzot who knew Oatman well. Judge Creuzot's testimony was

that Oatman was a very good lawyer and would have used these letters if he had them. (RRII:156-166). An affidavit from Dallas attorney Stuart Parker says the same thing.

8. Jackson elicited testimony from Hardeman that he had no understanding with the State that they would help on his cases and had engaged in no such discussions. Jackson knew these letters directly contradicted the very testimony he was eliciting from Hardeman. If he had revealed the Hardeman letters to Oatman, Jackson would not have elicited testimony that was directly contradicted by the letters.

9. Jackson admits that Hardeman gave false testimony at trial and that he did not fulfill his legal and ethical duty to correct the testimony. Jackson would not have elicited false testimony and failed to correct it when it was made if he had provided Oatman with the letters. Clearly, Jackson had no concern that Oatman would produce these letters to show the falsity of Hardeman's testimony. Since Oatman was, by Jackson's own admission and in the opinion of his well respected colleagues, a very good lawyer, the only reason Jackson would have been confident that Hardeman's false testimony would not be impeached by the letters is if he knew that Otman had never seen them.

10. Zane Smith testified that his case was already resolved, thus telling the jury that there was nothing the State could do to help him. However, the day after he testified against Mozee, he had written a letter to Jackson, confirming an earlier discussion where Jackson had promised he would intercede on Smith's behalf in his case, even

though his case was supposedly over with because he had already pled guilty and been sentenced. If Oatman knew about this letter, there is no question that he would have used it to show the jury that Smith's testimony was not accurate and that the State was going to help him secure a sentence reduction or other benefit even though his plea was already entered. And if Jackson had disclosed this Smith letter to Oatman, he would not have elicited this misleading testimony from Smith knowing that Smith's false statement would have been called out before the jury.

11. During Smith's testimony, he slipped up and mentioned writing a letter offering to testify in the Allen and Mozee cases. Oatman asked for a copy of this letter and the following occurred:

> MR. OATMAN:
> "Q. Okay. Did you send out a kite telling them you wanted to talk to them?
> A. No, I wrote the head District Court Clerk.
> Q. Okay. And tell them you had some information you wanted to talk to someone about; is that right?
> A. Yes, sir. Yes, sir.
> Q. Okay. You don't have a copy of that, do you?
> A. No, sir.
> MR. OATMAN: Could I ask if the State has a copy of that?
> MR. JACKSON: Yes, I sure do.
> (MR. JACKSON HANDS TO MR. OATMAN.)" (RRV:95-96).

In response, Jackson provided Smith's first letter (dated June 28, 2000), offering to testify, but not his second letter, setting out his discussions with Jackson and reminding Jackson that he said he would intercede on his behalf and seeking to collect on the benefit he had been promised. (RRV:91-96; Ex. II - filed with writ

memorandum). In fact, Jackson even offered the first innocuous letter into evidence. (RRV:110; State's Ex. 15).[10] Jackson's revelation of only the first Smith letter was a deliberate attempt to support the misleading testimony from Smith that his case was over and that there was nothing further to be done.

12. The fact that it came out during Smith's testimony that Oatman had not seen a letter Smith wrote directly contradicts any contention that Jackson showed Oatman any of the jailhouse letters. Jackson's memory reconstruction leads him to testify that he "thinks" he showed the letters to Oatman when he showed him the knife and physical evidence. He said this included the Smith letters. However, this in court exchange proves that Jackson never showed Oatman the letters.

In fact, if Jackson had shown the Smith letters to Oatman, he would have said so when Oatman asked for the letter. The fact that Jackson never claimed that he had already shown Oatman Smith's letters is further evidence that he had not done so. *See, United States v. Moore*, 522 F.2d 1068, 1075 (9th Cir. 1975), *cert. denied* 423 U.S. 1049 (1976) ("When an accusatory statement is made in the defendant's

_____

[10]During his testimony, Smith also admitted that he gave a written statement to Mr. Jackson. Jackson denied that Smith gave a written statement. The testimony was as follows:
"Q.     . . . Now, did you give a written statement to the -- did you talk to Mr. Jackson here? Is that who you talked to?
A.     Yes, sir.
Q.     And did you give a written statement to Mr. Jackson?
A.     Yes, sir.
Q.     Okay.
        MR. OATMAN: Could I see that, Your Honor?
        MR. JACKSON: Doesn't exist, Judge." (RRV:100-101).

presence and hearing, and he understands and has an opportunity to deny it, the statement and his failure to deny are admissible against him."); *Mumphrey v. State*, 774 S.W.2d 75 (Tex. App. - Beaumont 1989, *pet. ref'd*) (Where a statement or remark is made in defendant's presence, that he heard and understood and which statement called for reply or denial, silence or acquiescence may be shown as admissible fact having probative value; silence or acquiescence may even be shown as in nature of confession on his part); *King v. State*, 189 S.W.3d 347 (Tex. App. - Fort Worth 2006, *no pet.*) (discussing adoptive admissions). The theory of adoptive admissions squarely applies to the fact that Jackson did not protest that he had already disclosed to Oatman the Smith letter when this came up in trial.

13. Jackson's supposition that he showed Oatman these letters right before jury selection is also contradicted by the logistical problems inherent in his explanation. It is extremely unlikely, if not impossible, for Jackson to have showed Oatman so many documents that were (by his own admission) commingled with his own work product in several boxes of his individual files. Not only would this not have given Oatman an adequate opportunity to review those documents, but it would have created an enormous risk that Jackson's own meticulously organized file would become disorganized and/or that he would have inadvertently showed Oatman his work product, just as he was about to start a major capital murder trial. Under questioning by the Conviction Integrity Unit prosecutor, Jackson said the following:

"Q.   Because the bottom line is, is what you are telling us is for you to review all this, it would have taken you a couple of weeks. So I'm trying to understand if you're showing the file to Mr. Oatman on the day that you are picking the jury, I want to get some feel for how you could have gone through every single one, cleansed it of its work product, given it to Mr. Oatman, and not only have the time to do that, but give him the time to look at everything you were showing him on that day.
A.   It happened all the time.
Q.   How long did it take then?
A.   Maybe an hour or so." (RRII;135)

## IX.

## Legal Authority

It is axiomatic that deals, agreements, promises or expectations of leniency are exculpatory evidence that must be revealed under *Brady v. Maryland*, 373 U.S. 87 (1963). In *Lacaze v. Warden Louisiana Correction Institute for Women*, 645 F.3d 728 (5th Cir. 2010), the court addressed the question of when the *Brady* obligation arises. The court stated:

> ". . . the Supreme Court has never limited a *Brady* violation to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal. In *Napue v. Illinois*, 360 U.S. 264, 270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court explained that the key question is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness 'might have believed that [the state] was in a position to implement . . . any promise of consideration.' *Id.*; *see Giglio v. United States*, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) ('A promise is unnecessary.'). In fact, 'evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility.' *Giglio*, 405 U.S. at 155, 92 S.Ct. 763. The question is 'the extent to which the testimony misled the jury, not whether the promise was indeed a promise . . .' *Tassion*, 517 F.3d at 778 (citing *Napue*, 360 U.S. at 270, 79 S.Ct. 1173)."

In *Duggan v. State*, 778 S.W.2d 465 (Tex. Crim. App. 1989), the court said the same thing. The *Duggan* court states:

"This court rejected this very approach in *Burkhalter v. State*, 493 S.W.2d 214, 216-17 (Tex. Cr. App. 1973). There we decided that it was judicially imprudent to attempt to distinguish express agreements between the State and a testifying accomplice from those agreements which are merely implied, suggested, insinuated or inferred. Instead, we adopted, albeit implicitly, the standard articulated in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to determine whether such an agreement exists, *viz*: whether the evidence, newly discovered or otherwise, 'tends to confirm rather than refute the existence of some understanding for leniency.' *Burkhalter v. State*, *supra*, at 217, n. 1. It makes no difference whether the understanding is consummated by a wink, a nod and a handshake, or by a signed and notarized formal document ceremoniously impressed with a wax seal. A deal is a deal."

There is no disagreement that the letters from Hardeman and Smith were *Brady* material under these cases. Even Jackson admits he had a legal duty to turn this information over to defense counsel. The only question is whether he did so.

The question of whether the State withheld exculpatory evidence is not designed to lay blame or address the moral culpability of the prosecutor. In *Thomas v. State*, 841 S.W.2d 399, 402 (Tex. Crim. App. 1992), the court stated:

Because *Brady* was aimed at ensuring that an accused receives a fair trial rather than punishing the prosecutor for failing to disclose favorable evidence, the prosecution's obligation to disclose is not measured by the moral culpability, or the willfulness, of the prosecutor. In *Brady* cases, the good or bad faith of the state is irrelevant for due process purposes.

Thus, in considering whether the materials at issue were provided to the defense, the question is not whether the prosecutor acted in good faith or bad faith.

Rather, the court's focus is on whether the jury had the opportunity to hear all of the exculpatory or impeachment information available, and thus whether the Applicants received fair trials. The U.S. Supreme Court has explained that "a fair trial" under *Brady* is "understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The failure to provide exculpatory evidence to a defendant can occur for a variety of reasons. It can be an intentional or deliberate suppression of the exculpatory evidence. Or it can occur through simple oversight or by accident. In deciding this case, the Court does not need to determine why the letters were not turned over. Rather, once the Court finds that the evidence was suppressed, the motive of the prosecutor in failing to comply with his *Brady* obligation becomes irrelevant. The Court need only find the *Brady* violation and does not need to pass judgment on the good faith or bad faith of the prosecutor.

The record in this case clearly contradicts Judge Hawthorne's finding that Jackson revealed these jailhouse letters. He did not do so, thus violating a clear legal duty. Whether that was the result of inadvertence or an intentional violation is irrelevant under *Brady*.

Judge Stoltz has previously found that this exculpatory evidence was material, and Judge Hawthorne has not disturbed that finding. Therefore, this Court should find that the evidence was favorable to Allen, was not turned over to the defense and

was material and grant the requested relief.

## X.

## Jackson's Discussions With Informants

Jackson's testimony also establishes that he reached the kind of agreement that the case law defines as *Brady* material. In *Duggan, supra,* the court stated that agreements between the state and the informant "which are merely implied, suggested, insinuated or inferred," fit equally under *Brady* as an express agreement. *See Burkhalter v. State*, 493 S.W.2d 214, 216-17 (Tex. Crim. App. 1973); *see also, Lacaze, supra* (". . . the Supreme Court has never limited a *Brady* violation to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal.").

At the writ hearing, Jackson described his discussions with the informants, either directly or through the informant's lawyer, as him telling them that if they testify then he will talk to them about their cases later. He acknowledges that the informants offered to testify in order to obtain the State's help on their own cases, and that the informants were fully aware that the State would help them and they had an expectation that they would receive the help after they testify. Jackson's argument as to why he did not reveal these discussions to defense counsel is that he had not reached a firm deal as to what he would do for the informants. Of course, Jackson's belief that this type of agreement was not *Brady* material is clearly wrong under the

case law as a simple review of the *Duggan* case will show.

Therefore, in addition to the failure to turn over the jailhouse letters, and the failure to correct false testimony, Jackson also violated *Brady* by not informing the defense of his understanding with these informants. As stated previously, the case against Allen was built on testimony from informants who were testifying either with an expectation that the State would help them with their cases or who had already received help. Moreover, the record shows that the informants, who had not yet been helped, actually did receive help from Jackson or his agents.

The fact that the jury was misled by the actions of Jackson and the testimony of the informants, is absolutely clear. The testimony of Hardeman and Smith has already been discussed. Other informants gave similarly misleading testimony. For instance, John Paul Robinson was questioned by Jackson, and testified as follows:

"Q     Now, when Detective Berry came to see you, did he have any idea what you were talking about, who you were?
A     No.
Q     Okay. Did you ask Detective Berry for something?
A     No.
Q     Okay. Did you ask him if he could help you out in your case?
A     No.
Q     Okay. Did he offer to help you out in your case?
A     No.
Q     Okay. Have I -- I mean you and I have talked about this on one prior occasion; is that right?
A     Yes.
Q     All right. And have I told you that I was going to do anything for you in your case?
A     No." (RR4:33-34).

Jackson's own admission of what he told the informants shows the inaccuracy of this testimony. Moreover, Robinson was a habitual criminal who, after Jackson's intervention following his testimony, received 5 years probation on his Burglary of a Habitation case.

Jackson testified as follows at the writ hearing:

"Q.    I'm marking it Defendant's Exhibit Number 27.
A.    Okay.
Q.    So John Robinson had a burglary of a habitation case, right? It's a '98 case, right?
A.    That's what it says, yes.
Q.    Okay. And so he is going to court throughout the year 2000, '99, he has various court settings, trial settings, you know, he's waiting for things to happen on his case, right? Okay. And were you aware that at some point he had a trial and had a hung jury on his case? You don't remember any of that?
A.    I don't remember any of that.
Q.    And that he was looking at -- he had a burglary of a habitation case, second, meaning that it would make it a 15-year minimum. Was that your recollection of the law back at that point?
A.    Sure. I think so.
Q.    Okay. So he's looking at 15 years to life?
A.    When did burglary become a second-degree, what year?
Q.    I don't remember.
A.    Yeah, I don't either.
Q.    So -- but then back in 10/1/2000, if I'm reading that correctly, October of 2000.
A.    10/11.
Q.    10/11. Which would have been shortly after both of these trials, the Mozee and Allen cases were over with.
A.    Okay.
Q.    He got a five-year probation.
A.    Okay.
Q.    Okay. Now, do you recall going down and talking to the prosecutor on his case to get him the five-year probation?
A.    No.

Q. Okay. Do you think you did?

A. As I said, I would have gone down and said they cooperated. I wouldn't have -- because I wouldn't have known the strength of their case, I wouldn't have got involved in that. I would have just told them of the person's cooperation.

Q. Okay. So you have no reason to think that this John Robinson was handled any differently than any other snitch that you had to deal with, that you would have gone down and talked to the prosecutor about this case?

A. I don't --

Q. You don't remember it specifically, but you're not contesting that that's probably what happened because he did testify for you?

A. Yes.

Q. Okay. (RRII:144-145; Writ Ex. 27).

Other informants, such as Cynthia Sloan and Kenneth Jones, gave similar testimony denying they had any understanding or expectation of help from the State. (RRIII:150; RRIII:84).

Jackson testified as follows regarding Cynthia Sloan:

"Q. Okay. So tell us what memory you have about Cynthia Sloan at all.

A. I remember she was a witness. I mean, I don't recall any specifics.

Q. But since she was in jail and she had criminal problems, it would be a fair assumption, wouldn't it, that you were going to do something for her later if she testified in these cases based upon the way things went?

A. Yes. After she testified, sure.

Q. Okay. But you just don't remember what you did for her?

A. No, I don't remember. No." (RRII:97-98).

On Alvin Degraftenreed and Charles Manning, the State went a step further, and actually helped them with their probation violations prior to their testimony, a fact that Jackson referenced in his notes. (Writ Ex. 17). Degraftenreed testified that

he lived out his probation and was never revoked, without revealing that the reason he was not revoked was that Detective Berry intervened to convince the prosecutor and judge handing his case to disregard his probation violation based on his help to the State on the Allen and Mozee cases. (RRIII:186). Jackson was obviously aware of this, but did not reveal it to the defense counsel, as *Brady* required. Manning similarly had been saved by Detective Berry from the consequence of violating his probation based on his help on this case. Again, Jackson knew this based on his own notes, but did not reveal this to defense counsel.

Regardless of whether Jackson actually believed that all of this was not *Brady* material, which is hard to believe in light of 30 years of case law clearly defining it as such, he certainly violated *Brady* in not revealing this to defense counsel. This history is still further reason for this Court to find that it cannot have "confidence in the outcome of the trial," especially when Jackson has no recollection or documentation of turning over the informants' letters, but asks this Court to find that he did so because he "believes" it was his standard practice and he thinks he would have followed that practice here. The fact that Jackson engaged in a practice of suppressing and secreting numerous items of exculpatory evidence directly undermines any finding that he turned over the jailhouse letters.

## CONCLUSION

The record in this case shows that Jackson suppressed exculpatory evidence

concerning informant witnesses and failed to correct obvious false testimony from at least one of these witnesses. The importance of these informant witnesses is clear from a review of the Court of Appeals' opinion on direct appeal in this case. *Allen v. State*, 2002 WL 1481294 (Tex. App. - El Paso 2002). The Court's summary of the evidence listed the following witnesses as providing evidence against Allen:

Kenneth Jones

Samson Tinsaye

Alvin DeGraftenreed

Charles Manning

Cynthia Sloan

Lonel Hardeman

John Paul Robinson

Each one of these witnesses, except Samson Tinsaye, was someone with criminal problems of their own. Tinsaye was the only witness who was not receiving, hoping to receive or needing help from the State on their own cases. Tinsaye was a store clerk who testified to having received one of the victim's credit cards in a transaction. However, in his testimony, he said that Allen was not the person who passed the credit card. The person who passed the credit card was taller than Allen. (RRV:172-176). Thus, the only remaining evidence against Allen came from the informant witnesses hoping for help from the State.

Based on these facts, Allen prays that the Court will reject the supplemental fact findings entered on remand, adopt the findings of fact and law that were previously entered by Judge Stoltz and agreed to by the State in October 2014, and grant the requested relief.

Respectfully submitted,

GARY A. UDASHEN
Bar Card No. 20369590

BRUCE ANTON
Bar Card No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 fax
Appearing on Behalf of the
Innocence Project of Texas

*Counsel for Dennis Lee Allen*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2015, a true and correct copy of the above and foregoing Applicant's Objections to Trial Court's Supplemental Findings of Fact in Response to Remand Order was delivered to Cynthia Garza and Patricia Cummings, Assistant Dallas County District Attorneys.

GARY A. UDASHEN

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 73.1, undersigned counsel certifies that this document complies with:

1.      the type-volume limitation of TEX. R. APP. P. 73.1(d) because this document contains 14,858 words.

2.      the typeface requirements of TEX. R. APP. P. 73.1(e) because this document has been prepared in a conventional typeface using WordPerfect X5 in 14-point Times New Roman.


GARY A. UDASHEN